*376 WILLIAMS, Senior Circuit Judge,
dissenting:
I respectfully dissent from the court’s rejection of two defenses posed by Inter-American Investment Corporation (“IIC”): its claim of immunity to plaintiffs unjust enrichment claim and its invocation of the statute of limitations.
The immunity claim turns on the application of Article VII, § 3(a) of IIC’s Charter, see Maj. Op. at 278, under the International Organizations Immunities Act, 22 U.S.C. § 288a-k. Although the clause might seem to be either a venue provision or an across-the-board waiver, we have, in Mendaro v. World Bank, 717 F.2d 610 (D.C.Cir.1983), and later cases, construed such wording as waiving immunity only insofar as “necessary to enable the [organization] to fulfill its functions.” Id. at 617. We explained in Atkinson v. Inter-American Development Bank, 156 F.3d 1335 (D.C.Cir.1998), that Mendaro created a “default rule” under which the organization’s “immunity should be construed as not irnived unless the particular type of suit would further the [organization’s] objectives.” Id. at 1338. We explicitly rejected plaintiffs argument that the organization’s “immunity should be construed as waived unless the particular type of suit would impair [its] objectives.” Id.
Applying these concepts, in Mendaro we found no waiver for a claim under Title VTI of the Civil Rights Act of 1964 by a member of the organization’s administrative staff. Any benefits to the defendant from being subject to such suits, we said, would be “outweighed by the burdens caused by judicial scrutiny of the organization’s discretion to select and administer its programs.” Mendaro, 717 F.2d at 617. By contrast, we thought the immunity clearly covered suits involving the Bank’s securities and its guarantees of others’ securities, saying that the guarantees would mean little, and the Bank’s securities would be unappealing to investors, unless the Bank’s obligations were enforceable in court. Id. at 618.
Our analysis, then, has been to consider whether the defendant organization would, ex ante, have regarded its subjection to the sort of suit in question as likely to provide the organization a net benefit. As Atkinson made clear, ties go to the organization.
After the briefing in this case we found in Osseiran v. International Finance Corporation, 552 F.3d 836 (D.C.Cir.2009), that the defendant should be deemed to have waived immunity to a promissory estoppel claim based on alleged promises made during negotiations over the entity’s sale of securities to a private party. Noting that promises based on good faith alone are worth less than ones enforceable in court, we decided that a waiver of immunity “might help attract prospective investors by reinforcing expectations of fair play.” Id. at 840.
The court here extends Osseiran to unjust enrichment claims arising in the context of commercial transactions, at least if the case involves “contract negotiations [or] implicate^] the contract and quasi-contract principles on which the instant case turns.” Maj. Op. at 280 n. 3. Because unjust enrichment is a cause of action so much vaguer and broader than promissory estoppel, I believe the plausible benefits are thinner and the likely costs fatter here than in Osseiran — enough so that the Mendaro balance tilts against waiver.
A successful promissory estoppel claim requires “a promise which reasonably leads the promisee to rely on it to his detriment, with injustice otherwise not being avoidable.” N. Litterio & Co. v. Glassman Const. Co., 319 F.2d 736, 739 *377 (D.C.Cir.1963) (emphasis added). Though the promise required for a promissory estoppel claim “need not be as specific and definite as a contract, it must still be a promise with definite terms.” In re U.S. Office Products Co. Securities Lit., 251 F.Supp.2d 77, 97 (D.D.C.2003) (emphases added) (citing Bender v. Design Store Corp., 404 A.2d 194, 196 (D.C.1979)). Unjust enrichment, by contrast, requires only that: “(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances the defendant’s retention of the benefit is unjust.” News World Communications v. Thompsen, 878 A.2d 1218, 1222 (D.C.2005) (citing 4934, Inc. v. D.C. Dept. of Employment Servs., 605 A.2d 50, 55 (D.C.1992)). Thus unjust enrichment dispenses with the need for a definite promise, and requires in its place only a finding that the recipient’s retention of the benefit would be “unjust,” as determined by some fact-finder. The doctrine appears as elastic as the proverbial chancellor’s foot.
While an organization’s exposure to promissory estoppel claims may, at the margin, entice into negotiations people who attach value to being able to reasonably rely on definite promises by an organization’s agents, it is uncertain just who might be heartened by unjust enrichment doctrine’s vague assurances. Although the majority seeks to nudge this case toward Osseiran by suggesting that it involves “the credibility of the IIC’s promises,” Maj. Op. at 280-81, and thus perhaps the comparatively hard-edged quality of promissory estoppel, in fact Vila’s complaint makes no assertion whatever of promises by IIC — indeed, he never mentions the term. Quite rightly: unjust enrichment requires no evidence of promise. See Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins., 870 A.2d 58, 64 (explaining that unjust enrichment is not based on “a promise or agreement or intention of the person sought to be charged,” but on “equity and good conscience” (quoting Miller v. Schloss, 218 N.Y. 400, 113 N.E. 337, 339 (1916))).
In finding the benefit from exposure to unjust enrichment suits equal to that of exposure to promissory estoppel claims, the majority asserts that independent consultants would be “similarly hesitant to do business” absent the availability of unjust enrichment claims. Maj. Op. at 281 (emphasis added). But promissory estoppel enables one to reasonably rely on actual, definite promises; unjust enrichment protects the party only in scenarios where his sense of injustice happens to be shared by a jury. Apart from the likely difference in number of persons whose hesitancy may be relieved, promissory estoppel protection seems likely to draw in a more careful, businesslike set of counterparties.
On the cost side, unjust enrichment’s malleable nature means that being subject to such suits will expose IIC both to a much broader class of cases, and ones where the controlling issues are less sharply defined. The most obvious costs, of course, are the expenses of litigation itself, both out-of-pocket costs and the inevitable diversion of management focus. In Atkinson, though we didn’t need to “consider the cost side of the balance,” 156 F.3d at 1339, we expressly cited the “inconvenience, hazards, or expense of extended litigation” as a reason to doubt that the costs of a waiver of immunity in that case were minimal. Id. As the murkiness of the cause of action expands, so too, obviously, do the “inconvenience, hazards, or expense” of litigation.
The majority suggests that because courts also “consider unjust enrichment when evaluating claims for promissory estoppel,” promissory estoppel must be ev *378 ery bit as vague as unjust enrichment. Maj. Op. at 282. But in the presence of promissory estoppel’s requirement of a definite promise and reasonably foreseeable reliance, “unjust enrichment” seems unlikely to do much work in promissory estoppel cases; juries who find those two discrete points seem unlikely to worry much over elusive concepts of “injustice.”
Without some sort of empirical work it may be hard to calculate the exact effect of unjust enrichment’s vagueness. At a minimum, however, it would seem to increase the variance in outcomes, i.e., to quote Atkinson’s term, the “hazards” of litigation. For risk-averse litigants, variance is a material cost, even if plaintiffs win the same proportion of litigated unjust enrichment cases and enjoy the same average recovery as in promissory estoppel ones.
Besides, the majority’s claim that promissory estoppel requires a consideration of unjust enrichment in addition to its other elements entirely confirms the point that unjust enrichment claims reach a broader class of cases. That is why, in many cases, an unjust enrichment claim will survive after the court has thrown out promissory estoppel — even in the context of the commercial negotiations to which the majority tries to restrict its holding. See, e.g., Trianco, LLC v. IBM, 271 Fed.Appx. 198, 203, 205 (3d Cir.2008) (allowing an unjust enrichment claim to proceed, but dismissing a promissory estoppel claim because there was no “clear and unambiguous promise” (internal quotation marks omitted)); Lindquist Ford, Inc. v. Middleton Motors, Inc., 2007 WL 3287848, at *8, *11 (W.D.Wis.), rev’d on other grounds, 557 F.3d 469 (7th Cir.2009) (denying a motion for “summary judgment on plaintiffs unjust enrichment claim,” but dismissing the plaintiffs promissory estoppel claim because “plaintiffs have failed to adduce any evidence that defendant ever promised .... ”). Thus, the majority’s own reasoning illustrates why a waiver of unjust enrichment claims — untethered to a need for proof of a definite promise and reasonable reliance — exposes the IIC to a wider range of cases that would be costly to litigate.
Of course the majority is correct in saying that factors other than a cause of action’s protean character may complicate a case and generate high litigation costs, such as the volume of documents and the contentiousness of the parties. Maj. Op. at 282-83. But until the majority’s decision here, we have measured costs and benefits in terms of the cause of action and the type of plaintiff, not specifics of the case, presumably in order to achieve some measure of predictability. If I understand the majority correctly, its thought is that because there are cost factors that “vary from case to case,” we cannot meaningfully estimate the cost ranges associated with a particular cause of action. That seems a non sequitur.
In a similar vein, the court says that even though Atkinson clearly considered litigation expenses on the cost side of the equation, we cannot weigh them in this case because the Atkinson court gave “no guidance as to what kind of benefit would outweigh them.” Maj. Op. at 283 n. 4. To be sure, Atkinson did not need to weigh litigation costs; it found that subjection to wage garnishment proceedings would provide “no conceivable benefit” and ties go to the organization claiming immunity. Atkinson, 156 F.3d at 1338. But the fact that the Atkinson court did not explain how we are to weigh litigation costs cannot absolve us of the need to do so today.
The majority dismisses the IIC’s arguments regarding litigation expenses on several additional grounds. First, though it recognizes that the IIC pointed to litigation costs, see Maj. Op. at 281-82, 283 n. 4, *379 it appears to chide IIC for failing to differentiate the litigation costs likely to be associated with unjust enrichment claims from those associated with promissory estoppel suits. Maj. Op. at 282, 283 n. 4. But, as I mentioned before, Osseiran was decided only after the close of briefing in this case, and there we appeared to have no need to assess litigation costs at all; the defendant’s theory was apparently little more than that it was right on the merits. Moreover, as we are basically comparing causes of action, we should be perfectly able to do the comparison on our own.
The majority also seems to dismiss the IIC’s arguments regarding litigation costs on the grounds that these costs “could be true of any lawsuit.” Maj. Op. at 282. Of course, if litigation costs alone were enough to overcome all potential benefits from a waiver of immunity, then courts could never find a waiver. But under Mendaro and Atkinson we are obliged to weigh the reality of litigation costs, which are after all typically substantial, against the hypothetical benefit of the institution’s being subject to suit. Otherwise we jettison Atkinson’s understanding that Mendaro created a “default rule” under which the organization’s “immunity should be construed as not ■waived unless the particular type of suit would further the [organization’s] objectives.” 156 F.3d at 1338.
And, though acknowledging that Atkinson makes the relevance of litigation costs plain, the court suggests that because that case involved costs from an organization’s indirect participation in a wage garnishment proceeding, “a greater benefit would be required to outweigh them.” Maj. Op. at 283 n. 4. I do not understand the relevance of this point (let alone its justification), for in the end the majority either believes IIC’s litigation costs should be disregarded altogether (because they are “true of any lawsuit”), or simply rests on its conclusion that they are likely to be no greater than in promissory estoppel cases.
Apart from litigation costs, the IIC identifies an added element on the “cost” side of the balance, saying that without the “assurance” of arbitration, for which it provides when engaging independent consultants, see Agreement 2002, Joint Appendix (“J.A.”) 37, it would be “deterred from seeking to use independent contractors as consultants.” Appellant’s Br. 36. Although the utility of such consultants to IIC is undisputed (indeed, is the basis for the majority finding of a “benefit”), the court’s holding plainly makes its use of them more expensive. Any initial employee contact with a potential consultant will carry a risk of litigation, not to mention deny IIC the benefit of the arbitration provision that it insists on in its contracts. The court notes the impact, but offers IIC a strange solution. If IIC truly values arbitration, it says, “it can bar use of independent consultants who have not been engaged through a formal agreement.” Maj. Op. at 281. The court does not explain just how such an internal IIC policy could prevent third parties from bringing unjust enrichment suits. Perhaps the panel means that by living a completely virtuous life IIC can avoid litigation. But apart from the naiveté of the implied assumption about the filing of lawsuits, the argument has no place in our precedents, which have always focused on the costs that would come from particular types of claims, and has never inquired into whether or not an organization could prevent others from bringing such claims in the first instance. Indeed, this new factor sounds very like the merits, which we so roundly (and rightly) ruled off-limits in Osseiran, 552 F.3d at 840. Finally, however effective a policy aimed at reducing the risk of this sort of litigation might prove, it would itself come at a cost — that of increased *380 monitoring of employees’ compliance. The court’s ruling generates these costs all in order to give IIC the “benefit” of attracting consultants who do not bother to clarify their contractual status before proceeding to work.
Allowance of unjust enrichment claims thus generates greater costs and fewer benefits than the promissory estoppel claims permitted in Osseiran. I see no basis for concluding that a waiver of immunity is “necessary to enable [IIC] to fulfill its functions.” Mendaro, 717 F.2d at 617.
* * *
As to Part III of the majority opinion, concerning IIC’s statute of limitations defense, I agree with the majority that we should exercise pendant jurisdiction over the statute of limitations issue. See Maj. Op. at 283. I also agree that under District of Columbia law the statute is triggered not solely by the plaintiffs last rendition of services, but by defendant’s refusal of compensation for those services. See Maj. Op. at 284. Thus, if pri- or to October 26, 2003, Vila’s “last service has been rendered and compensation has been wrongfully withheld,” News World Communications Inc. v. Thompsen, 878 A.2d 1218, 1219 (D.C.2005) (emphasis added), Vila’s claim is barred. But I disagree with the court’s conclusion that Vila’s suit is not barred.
Vila argues that we should review the district court’s determination in his favor under a clearly erroneous standard, see Appellee’s Br. 15-16, but this is clearly wrong. The district court correctly observed that “[o]n a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), [the court] must construe the allegations and facts in the complaint in the light most favorable to the plaintiff.” Vila v. Inter-American Investment Corp., 536 F.Supp.2d 41, 45-46 (D.D.C.2008) (“District Court Opinion”). We review such rulings de novo. Kaemmerling v. Lappin, 553 F.3d 669, 676 (D.C.Cir.2008); see also, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (conducting a de novo review of plaintiffs’ 12(b)(6) motion). The panel today grants that we must apply the traditional de novo standard of review to Vila’s 12(b)(6) claim and that the determination of when Vila’s enrichment claim became unjust is based upon “granting Vila the benefit of all reasonable inferences.” Maj. Op. at 284 (emphasis added). Yet the court also says that when enrichment becomes unjust “is a question of fact for the district court to resolve.” Id. at 284. Insofar as this may imply that we should adopt the clearly erroneous standard of review urged by Vila, it runs directly contrary to our precedent and the Supreme Court’s practice. Hence, I will proceed under the traditional de novo standard: if Vila’s claimed date of the first legally relevant refusal is not plausibly supported by “the facts alleged” and “the allegations in the complaint,” we must reverse. Id.
Vila’s complaint alleges that his “Services were performed ... and accepted by Defendant’s senior officers and senior management from January to August 2003.” Compl. 11. Hence, there can be no doubt that Vila’s “last service ha[d] been rendered” prior to October 26, 2003. The only remaining issue then is whether IIC had refused to compensate Vila before that date.
As the court points out, Vila alleges at the outset of his complaint that he was refused payment on November 4, 2003. Maj. Op. at 284. The IIC does not contest that a refusal took place on November 4, 2003. What the IIC does contest, however, is Vila’s inference that the November 4, *381 2003, e-mail was the first legally relevant refusal to take place. And while the pleading standards required by Rule 12(b)(6) are extremely liberal, “the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint[, nor must it] accept legal conclusions cast in the form of factual allegations.” Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C.Cir.1994) (emphases added).
Vila’s complaint itself specifically alleges facts and inferences contradicting his claim that the first legally relevant refusal occurred on November 4, 2003. “On August 4, 2003, in an e-mail replying to Plaintiffs further compensation claims ... [Victor] Moscoso acknowledged Plaintiffs work, but refused to compensate it.” Compl. ¶ 14 (emphasis added). Victor Moscoso was the IIC Regional Head with whom Vila had discussed his compensation expectations for all of his services and who, according to Villa, had acknowledged Vila’s compensation expectation on IIC’s behalf on a prior occasion. See Compl. ¶ 11-13. But on August 4, 2003, again in Vila’s own words, “Mr. Moscoso attempted to justify the refusal to pay for Plaintiffs Services and suggested entirely new terms for future work by Plaintiff.” Compl. ¶ 14 (emphases added). Thus Vila clearly characterizes his e-mail contacts with Victor Moscoso as establishing that by August 4, 2003 Vila had provided his work to IIC and that IIC “refused” payment for that work, as opposed to “future work.” And since an unjust enrichment claim accrues “when its elements are present, so that the plaintiff could maintain a successful suit,” Thompsen, 878 A.2d at 1222, Vila’s own words establish that his claim had accrued before October 26, 2003.
Vila’s assertions about the Moscoso correspondence are enough to show that IIC should prevail, but his complaint contains further allegations contradicting his view that payment was first refused on November 4, 2003. “Following Mr. Moscoso’s refusal, Plaintiff appealed to Steven Reed, Defendant’s Deputy General Manager, in an attempt to obtain compensation.” Compl. ¶ 14 (emphases added). Of course, Vila’s unilateral decision to appeal Moscoso’s “refusal” could not extend the limitations period, regardless of how Reed responded: “Otherwise, a party could indefinitely extend the accrual date for the statute of limitations by simply making periodic requests of another party to enter an agreement.” GIV, LLC v. Int’l Bus. Machines Corp., 2007 WL 1231443, at *3 (E.D.Va. Apr. 24, 2007). See also Del. State College v. Ricks, 449 U.S. 250, 261 n. 15, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (“Mere requests to reconsider ... cannot extend the limitations period[ ]”). In any event, Reed, like Moscoso before him, “acknowledged Plaintiffs considerable amount of work, but refused to pay for Plaintiffs Services, alleging ... a different understanding of the agreement between Plaintiff and Defendant and the absence of a written contract.” Compl. ¶ 15 (emphasis added) (internal quotation marks omitted). Thus, according to Vila’s allegations, IIC twice refused to pay him before October 26, 2003.
The district court declined to give these refusals legal effect, saying that “none of the emails that predate the November 4, 2003 email ... were sufficiently unequivocal to cause the unjust enrichment claim to accrue.” District Court Opinion, 536 F.Supp.2d at 51. Specifically, the district court pointed to the fact that in both an August 28, 2003 email and a September 12, 2003 e-mail Reed had alluded to the possibility that Vila could receive a “success fee for some of his work.” Id. This argument fails for numerous reasons. First and foremost, under Vila’s own characteriza *382 tion of the prior correspondence, Moscoso “refused to compensate” Vila’s work, and after “attempting] to justify the refusal ... suggested entirely new terms for future work.” Compl. ¶ 14 (emphasis added). Rule 12(b)(6) of course requires us to draw all reasonable inferences in favor of the plaintiff, but it surely doesn’t require us to disregard factual allegations that flatly undermine a complaint.
Second, the district court was mistaken in its theory that Reed’s mention of a success fee somehow qualified the refusal. To be sure, Reed said in an August 28, 2003 e-mail that IIC “expect[ed] to sign the Safra agreement [on which Vila had worked] soon,” and that he would have a contract on the Safra matter prepared “so that when Safra instructs us to go to market, an agreement with you will be in place.” E-mail 262, J.A. 167. This needed confirmation from another IIC official, he said, but “I don’t see a problem. You will be compensated based on a success fee.” Id. But the possibility of some future compensation, which the district court recognized would only have been for “some work” Vila completed, District Court Opinion, 536 F.Supp.2d at 52, could not toll the statute of limitations because there is no reasonable basis for thinking that the success fee operated as any sort of substitute for the compensation Vila requested.
Indeed, Vila’s complaint treats Reed’s position as a refusal and rejects the notion of a success fee as a basis for payment. Vila points out “that there was no reference to compensation on a success fee basis in any of the numerous e-mails received from [IIC] senior officers, or in any other documentation exchanged between Defendant and Plaintiff from January to August 2003.” Compl. ¶ 17, J.A. 18. Consequently, Vila “reiterated his compensation claim” to Reed, which Reed again rejected, and Vila then submitted an invoice for $ 89,909.00. Compl. ¶¶ 17-18 (emphasis added). As the district court correctly found, this invoice amount, which Vila now requests as damages, “is based on calculations using a daily consulting fee,” not on a success fee calculation. District Court Opinion, 536 F.Supp.2d at 50. As Reed stated after Vila reiterated his claim for compensation following Reed’s initial rejection, “I don’t understand how you expected compensation on any basis other than a success fee.” E-mail 264, J.A. 168. Given that Vila sought compensation for all of his work, on an entirely different mode of compensation, we should interpret Reed’s email as Vila did — as a clear refusal of the compensation he requested and which he now requests in the current suit. Accord, Phillips v. Scott, 446 F.Supp.2d 70, 82 (D.Conn.2006) (unjust enrichment action accrued when mother refused to turn over proceeds of a property sale to son, even though mother mentioned “she might, at some unspecified time in the future, pay him some small portion of those proceeds”).
Oddly enough, though the district coui't regarded IIC’s November 4, 2003 e-mail as an unequivocal refusal on the theory that it did not include the possibility of “some compensation,” District Court Opinion, 536 F.Supp.2d at 52, that e-mail in fact did not rule out the possibility of a success fee. According to the complaint, once Vila “reiterate[d]” his invoice based on a daily consulting fee, IIC refused the requested payment on precisely the same grounds as Reed’s earlier e-mails — “the absence of a contract under ‘defined terms and conditions.’ ” Compl. ¶ 19. There is simply no meaningful differentiation between this email and any of its predecessors.
The court today crafts an entirely new theory for the accrual of Vila’s unjust enrichment claim — one not found in Vila’s briefs, the district court opinion, or any *383 relevant case law. The court seems to base its conclusion that “the district court could find ... that enrichment became unjust only on November 4,” on three arguments, none of which is persuasive. Maj. Op. at 284. First, the court claims that this was the first time Vila had submitted an invoice for a “specific amount of compensation.” Id. at 284. The prior emails to Moscoso and Reed, however, rejected the notion of any payment on Vila’s requested basis. Thus, whether Vila later asked for $1 or $1,000,000 was irrelevant, as he was aware he would not be getting any money without a written contract. Additionally, in News World Communications, Inc. v. Thompsen, 878 A.2d 1218 (D.C.2005), which governs here, the court found the plaintiff was refused payment not when she submitted an invoice, but when she received a phone call simply stating that “she would not be paid for her ideas or for the work she had done.” Id. at 1220. Thompsen explicitly held that it was enough that this phone call “informed [the plaintiff] that she would not be compensated.” Id. at 1222. Thus, there is simply no reason to think an invoice for a specific amount is necessary to start the statute running.
Second, the court argues that the emails to Moscoso did not cause the statute of limitations to accrue because only two of Vila’s projects involved Moscoso, and hence Moscoso would not have “known the totality of the work,” as the Personnel Office did. Maj. Op. at 284. The court argues that this makes the case distinguishable from Thompsen because there the plaintiff had a “one-on-one” relationship with the advertising director, who worked with the plaintiff on all the work she performed. Id. But Vila explicitly alleges that he spoke with Moscoso at the outset about compensation for the entirety of his services. See Compl. ¶ 13 (using the defined term “Services,” which referred to all services, when explaining that “Plaintiffs compensation expectation for the Services was discussed with Victor Moscoso”). There is also no reason to believe the rejection from Reed, Moscoso’s superior, was for fewer than all the projects. Additionally, in Thompsen the plaintiff had contacts with “several other representatives” besides the advertising director. Thompsen, 878 A.2d at 1220. The advertising director in Thompsen was the “relevant contact,” Maj. Op. at 285, only because he was the person who had confirmed the plaintiffs compensation expectations on a prior occasion, just as Vila alleges Moscoso had done. And the refusal in Thompsen did not come from the personnel department. The court offers no explanation why an e-mail from a personnel department official should be regarded as anything other than a reiteration of the refusal already communicated by a high-level official of the IIC, the Deputy General Manager, Steven Reed.
Third and finally, the court claims that because Vila worked for several people he could “have anticipated that he could go to their superior, General Manager Rogozinski, if his request for compensation were rebuffed”; the court claims the e-mails “indicate this is what happened.” Maj. Op. at 285. Not only does this argument seem entirely inconsistent with the precedent limiting a plaintiffs ability to extend limitations deadlines with repeated appeals, but, as already mentioned, Vila had previously discussed his compensation expectation for all services with both Moscoso and Reed (only one level below Rogozinski in the corporate hierarchy). Moreover, the e-mails hardly reveal the “appeals” process that the court dreams up. Rogozinski’s only response to Vila asked Vila not to contact him any more, but instead to pass his written consultant agreements on to the Personnel Office. E-mail 268, J.A. *384 175. Of course, Vila did not have such written agreements and already knew from his correspondence with Steven Reed that without such agreements he would not be paid, so it was hardly surprising when the personnel department then reiterated the exact same denial that Reed had already communicated.
The court’s readiness to treat any rejection as non-final has puzzling implications. If the refusal by the Deputy General Manager (Reed) was not enough because there was someone higher up in the chain, then it is entirely unclear why that of Rogozinski would start the statute of limitations running. After all, even after hearing from the Personnel Department, Vila “reiterated his claim” to the IIC’s President over the course of the next nine months. Compl. ¶¶ 20-21. Since a claim for unjust enrichment accrues only when all of its elements are present, the implication of the majority’s position is that Vila could not have brought a claim after the Moscoso or Reed e-mails refusing to pay him the very compensation he now claims he is owed, and perhaps cannot do so now— unless IIC’s President has actually rejected the claim.
The court faults all of the above arguments on the grounds that I “parse” Vila’s allegations instead of considering them in their “totality” and giving Vila the benefit of all favorable inferences. Maj Op. at 285. But one allegation with zero relevance, added to a dozen similar allegations, still results in allegations with zero relevance. In reality, my opinion gives Vila the benefit of all reasonable inferences, as it accepts Vila at his word: his complaint states he was “refused” compensation long before November 4, and characterizes all his subsequent contacts as “reiterations]” and “appeal[s].” The court, by contrast, goes out of its way to find inferences flatly contradicted by the allegations in Vila’s complaint, based on a theory that has no foundation in our case law or that of the District of Columbia. Accordingly, were it necessary to go beyond IIC’s immunity defense, which it is not, I would reverse on the ground of its statute of limitations argument, just as the court did in Thompson, 878 A.2d at 1226.