Janet E. ATKINSON, Appellant,

v.

The INTER–AMERICAN DEVELOP-
MENT BANK, et al., Appellees.

No. 97–7181.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 1998.

Decided Oct. 9, 1998.

As Amended Oct. 28, 1998.

William D. Rogers argued the cause for appellee The Inter–American Development Bank.* On the brief were Alexander E. Bennett and Nancy L. Perkins.

Before: EDWARDS, Chief Judge, SILBERMAN and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This case involves a well-known method of enforcing a judgment and a little-known immunity from judicial process. Appellant, in an effort to enforce two state court judgments against her former husband by garnishing his wages, sought a declaratory judgment in the district court that her husband's employer, a financial institution protected by the International Organizations Immunities Act, is not immune from garnishment proceedings under that Act. The district court, concluding that the employer was entitled to immunity under the Act, dismissed the declaratory judgment action. We affirm.

## I.

In 1993, a Maryland state court granted appellant Janet E. Atkinson a divorce from her husband, Robert J. Kestell. As part of the judgment of divorce, appellant was awarded alimony of $1,350 per month for four years; child support of $2,850 per month; $20,000 in attorney's fees; profits from rental property in the amount of $1,221.91; and a monetary award of $111,-475.00 to compensate her for her interest in marital property controlled by her husband. In 1996, the state court found Kestell in contempt of court for failure to pay alimony and child support during part of 1995, determined that his accrued arrearages totaled $12,600, and entered judgment for that amount.

Appellant's attempt to enforce these judgments gave rise to the instant litigation.[1]

Janet E. Atkinson, appearing pro se, argued the cause and filed the briefs.

---

* Robert J. Kestell was named as a defendant in appellant's complaint in the district court, but did not appear at any stage in the district court action or before us.

1. Kestell filed for Chapter 7 bankruptcy in Maryland shortly after the 1995 divorce decree. Appellant was the largest unsecured creditor in that bankruptcy case. Kestell's bankruptcy petition was ultimately dismissed under 11 U.S.C. §§ 707(b) and 105(a) because "the sole purpose of the filing was to avoid the payment of the sums owing to his ex-wife on account of the state

Kestell moved to Jamaica, taking with him all of his assets except one: the future wages that would be owed to him by his employer, appellee Inter–American Development Bank, an international financial institution headquartered in Washington, D.C. At Kestell's request and from salary due him, the Bank has paid appellant a total of $4,700 per month—the $1,350 per month alimony and $2,850 per month child support plus $500 per month toward his past arrearages.[2] But Kestell's cooperation goes only so far. He has steadfastly refused to pay appellant the remainder of her Maryland judgments, either from his Bank salary or otherwise. Accordingly, appellant sought to augment Kestell's voluntary monthly payments by garnishing the remainder of his salary.

Were Kestell's employer a run-of-the-mine private firm located in the District of Columbia, a garnishment proceeding would pose few difficulties; appellant would bring her Maryland judgments to D.C. Superior Court and proceed against the garnishee (*i.e.*, the employer) under the statutory scheme found in D.C.Code §§ 16–501 et seq. But the Bank is not a run-of-the-mine firm; rather, it is an institution that has been designated by executive order for protection as an international organization under the International Organizations Immunities Act (IOIA), Ch. 652, Title I, 59 Stat. 669 (1945) (codified as amended at 22 U.S.C. §§ 288 et seq. (1994)). *See* Exec. Order No. 10,873, 25 Fed.Reg. 3,097 (1960); Exec. Order No. 11,019, 27 Fed.Reg. 4,145 (1962). The IOIA entitles designated entities to "enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." 22 U.S.C. § 288a(b). And a provision of the Inter–American Development Bank Act grants the Bank the right to remove any action brought against it from state court into federal court. 22 U.S.C. § 283f.

This latter obstacle—the likely inability to proceed in state court—would not of itself hinder appellant's garnishment proceeding, as a federal court can adjudicate garnishment proceedings by applying the local statutory scheme. *See* FED.R.CIV.P. 69(a). Recognizing the more substantial hurdle of the Bank's immunity under the IOIA, appellant brought this declaratory judgment action in the district court to establish that the Bank had waived its immunity, and in the alternative that the Bank's immunity even absent waiver does not preclude a garnishment proceeding to enforce a divorce-related judgment incurred by an employee of a designated international organization such as the Bank. The Bank moved to dismiss the action, invoking its status as a protected organization under the IOIA and arguing that it had not waived its immunity with respect to this type of proceeding. Reviewing several cases in which we interpreted the extent to which the articles of agreement of the Bank and similar international organizations constitute a waiver of immunity, the district court granted the Bank's motion.

## II.

We begin, as the district court implicitly did, by assuming *arguendo* that appellee is entitled to absolute immunity under the IOIA and addressing appellant's contention that appellee has waived its immunity with respect to a proceeding to garnish one of its employee's wages.[3] Specifically, appellant points to the following provision in the Bank's articles of agreement:

> Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities.

Agreement Establishing The Inter–American Development Bank, Apr. 8, 1959, Art. XI,

court judgment." *In re Kestell*, 99 F.3d 146, 150 (4th Cir.1996).

**2.** As a result of the instant litigation, Kestell has agreed to have the Bank pay appellant an additional $1,710 per month from his salary.

**3.** Our assumption here is just that—an assumption. We take up the scope of immunity under the IOIA in Part III.

Section 3, 10 U.S.T. 3068, 3095. In *Lutcher S.A. Celulose e Papel v. Inter–American Development Bank*, 382 F.2d 454, 457 (D.C.Cir. 1967), we construed this provision as not merely a "venue provision for actions resulting from individual waivers; rather it is a provision waiving immunity and laying venue for the suits permitted."

The parties disagree on whether this waiver is broad enough to encompass a garnishment proceeding such as the one appellant hopes to bring. While the provision might be read to establish a blanket waiver of immunity from every type of suit not expressly prohibited elsewhere in the articles of agreement (only suits by members are expressly prohibited), we rejected that reading in *Mendaro v. World Bank*, 717 F.2d 610, 614–15 (D.C.Cir.1983) (citing *Lutcher*, 382 F.2d at 456) (interpreting identical language in the agreement establishing the World Bank). Instead, we adopted a test for determining when, in the context of a particular suit against the Bank, Section 3 should be construed as a waiver of immunity: "Since the purpose of the immunities accorded international organizations is to enable the organizations to fulfill their functions, applying the same rationale in reverse, it is likely that most organizations would be unwilling to relinquish their immunity without receiving a corresponding benefit which would further the organization's goals." *Id.* at 617.[4]

We then applied this test to hold that the World Bank had not waived its immunity from a Title VII sexual harassment suit by an employee. *See id.* at 618–19. We observed that such a waiver would expose the Bank to disruptive interference with its employment practices by requiring the Bank to adopt the local employment policies of each of its member countries, which would imply devastating administrative costs. Nor would those costs be justified by the benefit of attracting highly qualified staff members, in light of the Bank's already established administrative tribunal to resolve employees' contract grievances. We contrasted employee suits with suits based on commercial transactions with the outside world, where the benefits of a waiver would outweigh the costs: "If this immunity were not waived[,] the Bank would be unable to purchase office equipment or supplies on anything other than a cash basis. . . . Such a restriction would unreasonably hobble its ability to perform the ordinary activities of a financial institution operating in the commercial marketplace." *Id.* at 618; *see also id.* at 620 (explaining *Lutcher*'s holding that the Bank had waived suits by borrowers on the ground that such waiver "would directly aid the Bank in attracting responsible borrowers").

■ Appellant seeks to slip around the *Mendaro* test by asserting that "[a] wage garnishment action . . . does not threaten the bank's ability to fulfill its purpose and the functions with which it was entrusted." In her view, the Bank's immunity should be construed as *waived* unless the particular type of suit would *impair* the Bank's objectives; appellant contends that compliance with a garnishment order is a "simple, clerical operation" that would not cause such impairment. We think, however, that our formulation of the *Mendaro* test supports the opposite default rule: the Bank's immunity should be construed as *not waived* unless the particular type of suit would *further* the Bank's objectives. In *Mendaro*, we deemed the benefit of attracting talented employees by virtue of permitting suits by employees to be minimal given that employees already could invoke an internal grievance mechanism. Here, waiver of immunity from garnishment proceedings, unlike waiver of immunity from employee suits, provides no conceivable benefit in attracting talented employees; in fact, garnishment of an employee's wages makes the (prospective) employee worse off, not better off. This clear lack of benefit—indeed, disadvantage—of a

---

4. The agreement states that "[t]he purpose of the Bank shall be to contribute to the acceleration of the process of economic development of the member countries, individually and collectively." Article I, § 1, 10 U.S.T. at 3072. The Bank's functions include promoting the investment of public and private capital for development purposes; utilizing its own capital and other funds raised by it; encouraging private investment; assisting member countries in efficient use of their resources; and providing technical assistance for the implementation of development plans and projects. *Id.* § 2.

waiver of immunity from garnishment proceedings compels the conclusion that Section 3 of the agreement should not be construed to waive the Bank's immunity in this case.

Moreover, although we need not consider the costs side of the balance, we are skeptical of appellant's view that the costs imposed on a garnishee are minimal. In the analogous context of attempts to garnish the wages of federal employees, the Supreme Court long ago observed that the expense of defending such garnishment proceedings and complying with garnishment orders "might be fatal to the public service," *Buchanan v. Alexander,* 45 U.S. (4 How.) 20, 11 L.Ed. 857 (1846), a concern that has been echoed more recently, *see Stena Rederi AB v. Comision de Contratos,* 923 F.2d 380, 392 (5th Cir.1991) (observing that if garnishment were allowed "against foreign governmental agencies with operations in the United States to prosecute claims against third parties, the agencies would be required repeatedly to appear in court to protect their own relations with the third parties"); 30 AM.JUR. 2d *Executions and Enforcement of Judgments* § 646 (1994) (footnotes omitted) ("Garnishment statutes often exhibit concern for the protection of both the garnishee and other claimants who may be affected by the litigation, since a stranger to the proceedings in which a judgment has been obtained is an innocent third party who may be exposed to the inconvenience, hazards, or expense of extended litigation.").

### III.

There remains the question whether the Bank as a matter of statute enjoys immunity from garnishment proceedings. If the answer is no, then it does not matter whether it can be said that the Bank did not "waive" that immunity. The district court thought it unnecessary to reach this issue, *see* Mem. Op. (July 11, 1997) at 5 n.4 ("Because this case turns on the extent to which the language of the Bank's Articles of Agreement waives the Bank's immunity, it is not necessary to consider whether the Bank would, in

the absence of waiver, enjoy absolute immunity under the IOIA, or the more restricted immunity for noncommercial activities contemplated by the Foreign Sovereign Immunities Act. . . ."), undoubtedly because of our similar statement in *Mendaro,* 717 F.2d at 618 n. 54. We overlooked, however, that only if we concluded that the Bank had waived its immunity would we avoid the need to consider the scope of the Bank's immunity *ab initio.*

■ Appellant's first claim is that the IOIA does not contemplate immunity from garnishment proceedings. She argues there is a *de minimis* exception to the immunity granted by the IOIA, and that garnishment proceedings fall within that exception because the burden of being a garnishee is minimal. Yet even assuming the burden were minimal, a point on which we expressed doubts above, we think the plain language of the IOIA refutes the notion of a *de minimis* exception. The IOIA speaks in terms of "immunity from suit and *every form of judicial process,*" 22 U.S.C. § 288a(b) (emphasis added), language which admits of no exception for "unobtrusive" judicial processes. *Cf. Stena Rederi AB v. Comision de Contratos,* 923 F.2d 380, 392 (5th Cir.1991) (holding that garnishment proceedings are not excepted from the general jurisdictional immunity provided to foreign sovereigns by 28 U.S.C. § 1604, which provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States.").

■ Now to the more general, and more important, dispute between the parties—the scope of the immunity provided by the IOIA. The Bank submits that immunity under the IOIA is absolute and therefore poses a bar to any suit, regardless of its origin or subject matter. Appellant rejects that notion, contending that the IOIA, by virtue of its reference to "the same immunity from suit and every form of judicial process *as is enjoyed by foreign governments,*" 22 U.S.C. § 288a(b) (emphasis added), incorporates the commercial activities exception to immunity,[5] a cen-

---

**5.** We explicitly left this issue open in *Broadbent v. Organization of Am. States,* 628 F.2d 27, 32–33

(D.C.Cir.1980).

tral doctrine of the modern law governing the immunity of foreign governments from judicial process. She proceeds to argue that appellee's payment of wages to Kestell constitutes a commercial activity, so that her garnishment proceeding—a suit appellant depicts as arising out of that activity—is not barred.

We begin with the text of the IOIA. The operative provision states:

> International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the *same immunity from suit and every form of judicial process as is enjoyed by foreign governments,* except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.

22 U.S.C. § 288a(b) (emphasis added). "International organization" is defined as:

> a public international organization in which the United States participates . . . and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities provided in this subchapter.

22 U.S.C. § 288. Once the President issues such an order, his role under the IOIA does not cease. Rather, the President retains authority "by appropriate Executive Order" to "withhold or withdraw from any such organization . . . any of the privileges, exemptions and immunities provided for in this subchapter . . . or to condition or limit the enjoyment by any such organization . . . of any such privilege, exemption, or immunity." *Id.* And in the extreme case, the President is authorized to "revoke the designation of any international organization." *Id.*

The key phrase at issue in this case is the *"same immunity . . . as is enjoyed by foreign governments."* 22 U.S.C. § 288a(b) (emphasis added). Obviously, the 1945 Congress was legislating in shorthand, referring to another body of law—the law governing the immunity of foreign governments—to define the scope of the new immunity for international organizations. But did the 1945 Congress mean to refer to the law governing the immunity of foreign governments *as it*

*existed in 1945,* or to incorporate as well—as appellant claims—subsequent (*i.e.,* post–1945) changes to that body of law? When Congress enacted the IOIA in 1945, foreign sovereigns enjoyed—contingent only upon the State Department's making an immunity request to the court—"virtually absolute immunity." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *see* Robert B. von Mehren, *The Foreign Sovereign Immunities Act of 1976,* 17 COLUM. J. TRANSNAT'L L. 33, 41 (1978). In 1952, however, the landscape changed when the State Department announced its adoption of the restrictive theory of immunity, under which immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts. *Verlinden,* 461 U.S. at 487, 103 S.Ct. 1962 (citing Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952)). The State Department, following this restrictive theory, continued to make suggestions of immunity in appropriate cases, and the courts continued to defer to those suggestions as they had done prior to 1952. In 1976, Congress addressed problems of political pressure and non-uniformity inherent in this dual branch scheme by codifying the principle of restrictive immunity and shifting responsibility for its application to the courts. Foreign Sovereign Immunities Act of 1976, Pub.L. No. 94–583, 90 Stat. 2892 (codified as amended at 28 U.S.C. §§ 1602–1611).

As support for her contention that the 1945 Congress intended to incorporate in the IOIA post–1945 changes to the law governing the immunity of foreign sovereigns, appellant points us to this canon of interpretation: "A statute which refers to a subject generally adopts the law on the subject as of the time the law is enacted. *This will include all the amendments and modifications of the law subsequent to the time the reference statute [i.e.,* the statute that makes the reference] *was enacted."* 2B SUTHERLAND STATUTORY CONSTRUCTION § 51.08, at 192 (Norman J. Singer, 5th ed.1992) (footnotes omitted) (emphasis added). Before resorting to this or

any other canon, however, we must search for indications of legislative intent. As the Supreme Court has observed, canons of statutory interpretation are principally "useful in close cases, or when statutory language is ambiguous." *United States v. Monsanto,* 491 U.S. 600, 611, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989); *see also United States v. United Mine Workers of Am.,* 330 U.S. 258, 314, 67 S.Ct. 677, 91 L.Ed. 884 (1947) (Frankfurter, J., concurring) ("[A] canon, like other generalities about statutory construction, is not a rule of law. Whatever persuasiveness it may have in construing a particular statute derives from the subject matter and the terms of the enactment in its total environment."); *United States v. Espy,* 145 F.3d 1369, 1371 (D.C.Cir.1998) ("Since we do not find the statute in the least bit ambiguous, we have no need to employ, nor any legitimate purpose in employing, canons of construction designed to reconcile confusing language.").

The text of the IOIA unfortunately provides no express guidance on whether Congress intended to incorporate in the IOIA subsequent changes to the law governing the immunity of foreign sovereigns. That does not mean, however, that the statutory text is completely unhelpful. As explained above, the IOIA sets forth an explicit mechanism for monitoring the immunities of designated international organizations: the President retains authority to modify, condition, limit, and even revoke the otherwise absolute immunity of a designated organization. *See* 22 U.S.C. § 288. It seems, therefore, that Congress was content to delegate to the President the responsibility for updating the immunities of international organizations in the face of changing circumstances. This built-in mechanism for updating the IOIA undermines appellant's claim that Congress intended a different updating mechanism: automatic alteration of the scope of immunity under the IOIA in accordance with developments in the law governing the immunity of foreign sovereigns.

The legislative history supports this reading. The Senate Report describes the provision delegating to the President the authority to modify an organization's immunities as "permit[ting] the adjustment or limitation of the privileges in the event that any international organization should engage, for example, in activities of a commercial nature." S.REP. No. 861, 79th Cong., 1st Sess., at 2 (1945). Not only does this description of the President's role suggest that responsibility for modifying immunity granted by the IOIA rests with the President rather than with an evolving separate body of law (even if that separate body of law would be heavily influenced by the President acting through the State Department), it does so with specific regard to the notion of restrictive immunity for commercial activities. The concerns that motivated the State Department to adopt the restrictive immunity approach to foreign sovereigns in 1952 (and Congress to codify those principles in the FSIA in 1976) were apparently taken into account by the 1945 Congress.

In light of this text and legislative history, we think that despite the lack of a clear instruction as to whether Congress meant to incorporate in the IOIA subsequent changes to the law of immunity of foreign sovereigns, Congress' intent was to adopt that body of law only as it existed in 1945—when immunity of foreign sovereigns was absolute.[6] (As we noted above, absolute immunity under the IOIA is merely a baseline that is subject to modification by executive order.) The canon appellant urges on us is but one factor in discerning Congress' intent, and we think it is outweighed by the text and legislative history in this case.

█ There remains one final issue: the impact, if any, of the 1976 enactment of the FSIA. The FSIA explicitly makes reference to the IOIA, a reference that appellant views as providing support for her claim that the IOIA incorporates post-1945 changes to the law governing the immunity of foreign sovereigns. 28 U.S.C. § 1611 provides:

**6.** We accordingly disapprove of the contrary holding in *Rendall–Speranza v. Nassim,* 932

F.Supp. 19, 23–25 (D.D.C.1996).

Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the [IOIA] shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as a result of an action brought in the courts of the United States.

Appellant draws two inferences, one general and one specific, from this passage. The general is that Congress' reference to the IOIA, in the course of this codification of the restrictive immunity doctrine for foreign sovereigns, indicates that Congress was aware of the impact of the restrictive immunity doctrine on the IOIA; by choosing not to revise the IOIA, Congress expressed its intent to apply restrictive immunity to international organizations under the IOIA. We think this argument has little merit. Congress does not express its intent by a failure to legislate, *United States v. Estate of Romani*, — U.S. —, —, 118 S.Ct. 1478, 1488, 140 L.Ed.2d 710 (1998) (Scalia, J., concurring), and even if it did, the will of a later Congress as to the meaning of a law enacted by an earlier Congress is of little weight, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 77 n. 6, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); *Estate of Romani*, — U.S. at —, 118 S.Ct. at 1489 (Scalia, J., concurring) ("If the enacted intent of a later Congress cannot change the meaning of an earlier statute, it should go without saying that the later unenacted intent cannot possibly do so.").

Appellant's alternative argument is that 28 U.S.C. § 1611, insofar as it prohibits "attachment or any other judicial process impeding the disbursement of funds [held by an IOIA-protected entity] *to ... a foreign state* as the result of an action brought in the courts of the United States or of the States" (emphasis added), gives rise to a negative implication that funds held by an IOIA-protected entity for disbursement to a *non-foreign state* (such as an employee) are not protected from attachment or garnishment. As best we can tell, appellant relies on the canon *expressio unius est exclusio alterius* in making this

argument. But we think the inference appellant seeks to draw is rather strained. As we recently observed, "the force [of the *expressio unius* canon] in particular situations depends entirely on context." *Shook v. District of Columbia Fin. Responsibility and Management Assistance Auth.*, 132 F.3d 775, 782 (D.C.Cir.1998). Here, context suggests, if anything, that the 1976 Congress wished to clarify that international organizations deserve special protection. In §§ 1609 through 1611 of the FSIA, Congress focused on the issue of when and how judgments could be enforced against the property of foreign states. Section 1609 states the general rule that the property of foreign states is immune from attachment or execution, and § 1610 sets forth exceptions to the general rule that are roughly analogous to the commercial activity exception to jurisdictional immunity in § 1605. Section 1611 then provides that notwithstanding § 1610, a judgment creditor cannot execute upon funds held by international organizations for disbursement to the foreign state judgment debtor. Thus, it is clear that Congress' emphasis in these provisions of the FSIA was on the situation of a foreign state as judgment debtor, not on other types of judgment debtors. The FSIA is "beside the point" because it does not "reflect any direct focus by Congress upon the meaning of the earlier enacted provisions" of the IOIA. *Almendarez-Torres v. United States*, — U.S. —, —, 118 S.Ct. 1219, 1227, 140 L.Ed.2d 350 (1998) (citations omitted).

## IV.

 Even if we concluded that the IOIA's reference to the law of immunity of foreign sovereigns is an evolving one that incorporates the commercial activities exception to immunity, we think appellant's garnishment proceeding would not come within that exception. As relevant here, the FSIA's formulation finds the commercial activities exception satisfied where "the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). To determine whether an action is "based upon a commercial activity," we look to "those elements of a claim

that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson,* 507 U.S. 349, 357, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993).

A garnishment proceeding would require appellant to demonstrate two principal elements. To obtain a writ of garnishment, appellant would need to show the amount of the debt owed by Kestell to her and the judgment giving rise to that debt. D.C.Code § 16–501(c)(1)-(2). To levy the writ on the Bank as garnishee, appellant would have to demonstrate that the Bank owed wages to Kestell. *Id.* § 16–544. Neither of these elements relates to a commercial activity of the Bank. The judgment appellant seeks to enforce arises out of Kestell's desertion of her and the resulting grant of divorce by the Maryland state court. Kestell, though an agent of the Bank, certainly cannot be said to have engaged in these marital (or more accurately, "anti-marital") activities in his official capacity as an agent of the Bank. *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1028 (D.C.Cir.1997) ("[T]he relevant inquiry in determining whether an individual was acting in an official capacity focuses on the nature of the individual's alleged actions."). Nor is the Bank's payment of wages to Kestell a commercial activity. *See Broadbent v. Organization of Am. States,* 628 F.2d 27, 34 (D.C.Cir. 1980) (holding that an international organization's employment of civil servants, regardless of their nationality, is not a commercial activity).

Because neither of these principal elements of a garnishment proceeding rests on a commercial activity of the Bank, the commercial activities exception would not apply and the Bank would remain immune from jurisdiction under the general rule of 28 U.S.C. § 1604. The judgment of the district court is

*Affirmed.*