Concurring opinion filed by Circuit Judge PILLARD.
SILBERMAN, Senior Circuit Judge:
Appellants, a group of Indian nationals, challenge a district court decision dismissing their complaint against the International Finance Corporation (IFC) on grounds that the IFC is immune from their suit. The IFC provided loans needed for construction of the Tata Mundra Power Plant in Gujarat, India. Appellants who live near the plant alleged—which the IFC does not deny—that .contrary to provisions of the loan agreement, the plant caused damage to the surrounding communities. They wish to hold the IFC financially responsible for their injuries, but we agree with the well-reasoned district court opinion that the IFC is immune to this suit under the International Organizations Immunities Act, and did not waive immunity for this suit in its Articles of Agreement.
I.
Appellants are fishermen, farmers, a local government entity, and a trade union of fishworkers. They assert that their way of life has been devastated by the power plant.[1]
The IFC, headquartered in Washington, is an international organization founded in 1956 with over 180 member countries. It provides loans in the developing world to projects that cannot command private capital. IFC Articles, art. Ill § 3(i), Dec. 5, 1955, 7 U.S.T. 2197, 264 U.N.T.S. 117. The IFC loaned $450 million to Coastal Gujarat Power Limited, a subsidiary of Tata Power, an Indian company, for construction and operation of the Tata Mundra Plant. The loan agreement, in accordance with IFC’s policy to prevent social and environmental damage, included an Environmental and Social Action Plan designed to protect the surrounding communities. The loan’s recipient was responsible for complying with the agreement, but the IFC retained supervisory authority and could revoke financial support for the project.
Unfortunately, according to the IFC’s own internal audit conducted by its ombudsman, the plant’s construction and operation did not comply with the Plan. And the IFC was criticized by the ombudsman for inadequate supervision of the project. Yet the IFC did not take any steps to force the loan recipients into compliance with the Plan.
The appellants’ claims are almost entirely based on tort: negligence, negligent nuisance, and trespass. They do, however, raise a related claim as alleged third party contract beneficiaries of the social and environmental terms of the contract. According to appellants, the IFC is not immune to these claims, and, even if it was statuto *705 rily entitled to immunity, it has waived immunity.
II.
Appellants are swimming upriver; both of their arguments run counter to our long-held precedent concerning the scope of international organization immunity and charter-document immunity waivers.
The IFC relies on the International Organizations Immunities Act (IOIA), which provides that international organizations “shall enjoy the same immunity from suit ... as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.” 22 U.S.C. § 288a(b). The President determines whether an organization is entitled to such immunity. 22 U.S.C. § 288. The IFC has been designated an international organization entitled to the “privileges, exemptions, and immunities” conferred by the statute. Exec. Order No. 10,680, 21 Fed. Reg. 7,647 (Oct. 5,1956).
In response to the IFC’s claim of statutory entitlement under the IOIA, appellants rather boldly assert that Atkinson v. Inter-Am. Dev. Bank, 156 F.3d 1335 (D.C. Cir. 1998), our leading case on the immunity of international organizations under that statute, should not be followed. Atkinson held that foreign organizations receive the immunity that foreign governments enjoyed at the time the IOIA was passed, which was “virtually absolute immunity.” Id. at 1340 (quoting Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). And that immunity is not diminished even if the immunity of foreign governments has been subsequently modified, particularly by the widespread acceptance and codification of a “commercial activities exception” to sovereign immunity. E.g., 28 U.S.C. § 1605(a)(2).
Attacking Atkinson, appellants make two related contentions. First, Atkinson was wrong to conclude that when Congress tied the immunity of international organizations to foreign sovereigns, it meant the immunity foreign sovereigns enjoyed in 1945. Instead, according to appellants, who echo the arguments pressed in Atkinson itself, lawmakers intended the immunity of the organizations to rise or fall—like two boats tied together—with the scope of the sovereigns’ immunity. In other words, even assuming foreign sovereigns enjoyed absolute immunity in 1945, if that immunity diminished, as it has with the codification of the commercial activity exception, Congress intended that international organizations fare no better.
The problem with this argument—even if we thought it meritorious, which we do not—is that it runs counter to Atkinson’s holding, which explicitly rejected such an evolving notion of international organization immunity. See 156 F.3d at 1341. We noted that Congress anticipated the possibility of a change to immunity of international organizations, but explicitly delegated the responsibility to the President to effect that change—not the judiciary. Id. Morever, when considering the legislation, Congress rejected a commercial activities exception—which is exactly the evolutionary step appellants wish to have us adopt. Id. As the district court recognized, we recently reaffirmed Atkinson, saying that the case “remains vigorous as Circuit law.” Nyambal v. Int’l Monetary Fund, 772 F.3d 277, 281 (D.C. Cir. 2014).
Recognizing that a frontal attack on Atkinson’s holding would require an en banc decision, appellants next argued that we can, and should, bypass its precedential impact because the Supreme Court has undermined its premise—that in 1945 the *706 immunity of foreign sovereigns was absolute (or virtually absolute).
To be sure, the Court has said in dicta that in 1945, courts “ ‘consistently ... deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction’ over particular actions against foreign sovereigns....” Republic of Austria v. Altmann, 541 U.S. 677, 689, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (quoting Verlinden, 461 U.S. at 486, 103 S.Ct. 1962). But as a matter of practice, at that time, whenever a foreign sovereign was sued, the State Department did request sovereign immunity. Id. The only arguable exception involved a lawsuit in rem against a ship owned but not possessed by Mexico; it was not a suit against Mexico. See Republic of Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945). And, even if appellants are correct that the executive branch played an important role in immunity determinations in 1945, that does not diminish the absolute nature of the immunity those sovereigns enjoyed; although Supreme Court dicta refers to the mechanism for conferring immunity on foreign sovereigns in 1945, Executive Branch intervention does not speak to the scope of that immunity.
In any event, the holding of Atkinson— regardless how one characterizes the immunity of foreign sovereigns in 1945—was that international organizations were given complete immunity by the IOIA unless it was waived or the President intervened. And as we noted, that holding was reaffirmed in Nyambal after the Supreme Court dicta on which appellants primarily rely. Therefore, we conclude our precedent stands as an impassable barrier to appellants’ first argument.
III.
That brings us to the waiver argument. There is no question that the IFC has waived immunity for some claims. Indeed, its charter, read literally, would seem to include a categorical waiver.[2] But our key case interpreting identical waiver language in the World Bank charter, Mendaro v. World Bank, 717 F.2d 610 (D.C. Cir. 1983), read that language narrowly to allow only the type of suit by the type of plaintiff that “would benefit the organization over the long term,” Osseiran v. Int’l Fin. Corp., 552 F.3d 836, 840 (D.C. Cir. 2009) (citing Atkinson, 156 F.3d at 1338 and Mendaro, 717 F.2d at 618).[3]
*707 To be sure, it is a bit strange that it is the judiciary that determines when a claim “benefits” the international organization; after all, the eases come to us when the organizations deny the claim, and one would think that the organization would be a better judge as to what claims benefit it than the judiciary. Perhaps that is why Osseiran, when applying Mendaro, refers to long-term goals, rather than immediate litigating tactics.
But whether or not the Mendaro test would be better described using a term different than “benefit,” it is the Mendaro criteria we are obliged to apply. Ironically, the line of cases applying Mendaro ended up tying waiver to commercial transactions, so there is a superficial similarity to the commercial activities test that appellants would urge us to accept. But whatever the scope of the commercial activities exception to sovereign immunity, that standard is necessarily broader than the Mendaro test; if that exception applied to the IFC, the organization would never retain immunity since its operations are solely “commercial,” i.e., the IFC does not undertake any “sovereign” activities.
The Mendaro test instead focused on identifying those transactions where the other party would not enter into negotiations or contract with the organization absent waiver. See 717 F.2d at 617 (inferring waiver only insofar as “necessary to enable the [organization] to fulfill its functions”). Mendaro provided examples: suits by debtors, creditors, bondholders, and “those other potential plaintiffs to whom the [organization] would have to subject itself to suit in order to achieve its chartered objectives.” Id. at 615.
We have stretched that concept to include a claim of promissory estoppel, see Osseiran, 552 F.3d at 840-41, and a quasi-contract claim of unjust enrichment, see Vila v. Inter-Am. Invest. Corp., 570 F.3d 274, 278-80 (D.C. Cir. 2009). But all the claims we have accepted have grown out of business relations with outside companies (or an outside individual engaged directly in negotiations with the organization).[4] Compare Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank, 382 F.2d 454 (D.C. Cir. 1967) (finding waiver in debtors’ suit to enforce loan agreement) with Mendaro, 717 F.2d at 611 (rejecting employee sexual harassment and discrimination claim); Atkinson, 156 F.3d at 1336 (rejecting garnishment proceeding against organization employee).
Appellants attempt to define “benefit” more broadly. They argue that holding the IFC to the very environmental and social conditions it put in the contract, conditions which the IFC itself formulated, would benefit the IFC’s goals. Even though appellants had no commercial relationship with the IFC (other than, allegedly, as third party beneficiaries of the loan agreement’s requirements), they contend that the IFC will benefit from their lawsuit because they are attempting to hold the IFC to its stated mission and to its own compliance processes. They argue that obtaining “community support” is a required *708 part of any IFC project, and suggest that communities will be unlikely to support IFC projects if the IFC is not amenable to suit. Appellants’ ability to enforce the requirement that the IFC protect surrounding communities is as central to the IFC’s mission as a commercial partner’s ability to enforce the requirement that the IFC pay its electricity bill.
But Mendaro drew another distinction between claims that survive and those that don’t. Those claims that implicate internal operations of an international organization are especially suspect because claims arising out of core operations, not ancillary business transactions, would threaten the policy discretion of the organization. Accord Vila, 570 F.3d at 286-89 (Williams, J., dissenting).
That notion applies here. Should appellants’ suit' be permitted, every loan the IFC makes to fund projects in developing countries could be the subject of a suit in Washington.[5] Appellee’s suggestion that the floodgates would be open does not seem an exaggeration. Finally, if the IFC’s internal compliance report were to be used to buttress a claim against the IFC, we would create a strong disincentive to international organizations using an internal review process. So even though appellants convince us that the term “benefit” is something of a misnomer—its claim in some sense can be thought of as a “benefit”—it fails the Mendaro test.
Accordingly, the district court decision is affirmed.

So ordered.

. Appellants’ complaint paints a dismal picture. For example, the plant’s cooling system discharges thermal pollutipn into the sea, killing off marine life on which fishermen rely for their income. Saltwater intrusion into the groundwater—a result of the plant’s construction—means that farmers can no longer use that water for irrigation. (In fact, the villagers must purchase elsewhere freshwater necessary for consumption.) And because the plant is coal-powered, coal must be transported from nine miles away on an open-air convey- or system. During that relocation, coal dust and ash disperse into the atmosphere and contaminate the surrounding land and air.

. The Articles of Agreement contains the following provision, titled "Position of the Corporation with Regard to Judicial Process”:
Actions may be brought against the Corporation only in a court of competent jurisdiction in the territories of a member in which the Corporation has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities. No actions shall, however, be brought by members or persons acting for or deriving claims from members. The property and assets of the Corporation shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Corporation.
IFC Articles, art. 6, § 3(vi). That provision carries “full force and effect in the United States" under the International Finance Corporation Act. 22 U.S.C. § 282g.

. Appellants argue that Mendaro impermissi-bly overruled our earlier case, Lutcher S.A. Celulose e Papel v. Inter-American Development Bank, 382 F.2d 454 (D.C. Cir. 1967), without an intervening Supreme Court or en banc decision. Appellants rely on dicta in Lutcher, but its holding was that the Inter-American Development Bank waived immunity to a breach of contract suit by a debtor. 382 F.2d at 456-68. Mendaro expressly considered the rationale of Lutcher and declined to extend its holding to the suit before it. 717 F.2d at 614-17. Indeed, the Mendaro test emerged in part from Lutcher's discussion that the charter language at issue indicated waiver *707 where "vulnerability to suit contributes to the effectiveness of the [organization's] operations.” Lutcher, 382 F.2d at 456.

. Appellants do present a third party beneficiary claim, which, unlike their other claims, sounds in principles of contract law. We have previously found the distinction between contract and non-contract claims relevant. See Vila, 570 F.3d at 280 n.3. But even if appellants qualified as third party beneficiaries, a point we do not address, they were not a necessary negotiating party. Accordingly, inferring waiver in this case stands at odds with the reasoning in Mendaro, i.e., that Mendaro implies waiver when the parties negotiated with the background of international organization immunity.

. We need not reach appellee’s alternative argument that this case may be dismissed under the doctrine of forum non conveniens.