PILLARD, Circuit Judge,
concurring:
I agree that Atkinson and Mendaro, which remain binding law in this circuit, control this case. I write separately to note that those decisions have left the law of international organizations’ immunity in a perplexing state. I believe both cases were wrongly decided, and our circuit may wish to revisit them.
1. The International Organizations Immunities Act (IOIA), Pub L. No. 79-291, 59 Stat. 669 (1945) (codified at 22 U.S.C. § 288 et seq.), grants international organizations the same immunity “as is enjoyed by foreign governments.” Id. § 2(b). When Congress enacted the IOIA in 1945, foreign states enjoyed “virtually absolute immunity,” so long as the State Department requested immunity on their behalf. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). President Eisenhower designated the IFC as entitled to immunity under the IOIA in 1956. See Exec. Order No. 10,680, 21 Fed. Reg. 7,647 (Oct. 5, 1956). Congress and the courts have since recognized that foreign governments’ immunity is more limited, as described by the Foreign Sovereign Immunities Act. 28 U.S.C. §§ 1604-05; see Republic of Argentina v. Weltover, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). We took a wrong turn in Atkinson when we read the IOIA to grant international organizations a static, absolute immunity that is, by now, not at all the same “as is enjoyed by foreign governments,” but substantially broader.
When a statute incorporates existing law by reference, the incorporation is generally treated as dynamic, not static: As the incorporated law develops, its role in the referring statute keeps up. Atkinson itself correctly acknowledged that a “statute [that] refers to a subject generally adopts the law on the subject,” including “all the *709 amendments and modifications of the law subsequent to the time the reference statute was enacted.” Atkinson v. Inter-American Development Bank, 156 F.3d 1335, 1340 (D.C. Cir. 1998) (emphasis omitted); see El Encanto, Inc. v. Hatch Chile Co., 825 F.3d 1161, 1164 (10th Cir. 2016).
The IOIA references foreign sovereign immunity, but in Atkinson we did not apply the familiar rule of dynamic incorporation because we thought another IOIA provision showed that Congress intended that reference to be static. Section 1 of the IOIA authorizes the President to “withhold or withdraw from any such [international] organization or its officers or employees any of the privileges, exemptions, and immunities provided for” by the IOIA. IOIA § 1. We read that language to mean that Congress intended the President alone to have the ability, going forward, to adjust international organizations’ immunity from where it stood as of the IOIA’s enactment in 1945. Atkinson, 156 F.3d at 1341. That presidential power was, we thought, exclusive of any shift in international organizations’ immunity that might be wrought by developments in the law of foreign sovereign immunity to which the IOIA refers.
Correctly read, however, section 1 merely empowers the President to make organization- and function-specific exemptions from otherwise-applicable immunity rules. It says that the President may “withhold or withdraw from any such organization”—note the singular—“or its officers or employees any of the privileges, exemptions, and immunities” otherwise provided for by the IOIA. IOIA § 1 (emphasis added). Section 1 thus empowers the President to roll back an international organization’s immunity on an organization-specific basis. See, e.g., Elizabeth R. Wilcox, Digest of United States Practice in International Law 405 (2009) (describing President Reagan’s 1983 exercise of section 1 authority to withhold immunity from INTERPOL, followed by President Obama’s 2009 restoration of the immunity after INTERPOL opened a liaison office in New York). Nothing about section 1 suggests that Congress framed or intended it to be the exclusive means by which an international organization’s immunity might be determined to be less than absolute.
The inference we drew from section 1 in Atkinson seems particularly strained because it assumes that Congress chose an indirect and obscure route to freezing international organizations’ immunity over a direct and obvious one. If Congress intended to grant international organizations an unchanging absolute immunity (subject only to presidential power to recognize organization-specific exceptions) it could have simply said so. It might have expressly tied international organizations’ immunity to that enjoyed by foreign governments as of the date of enactment. Or, even better, it might have avoided cross-reference altogether by stating that international organizations’ immunity is absolute. As it happens, the original House version of the IOIA did just that, providing international organizations “immunity from suit and every form of judicial process.” H.R. 4489, 79th Cong, (as introduced, Oct. 24, 1945; referred to H. Comm, on Ways and Means), but the Senate rejected that as “a little too broad,” 91 Cong. Rec. 12,531 (1945), even as it retained the absolute immunity language in provisions granting the property of international organizations immunity from search, confiscation and taxation. See IOIA §§ 2(c), 6. In lieu of the House version’s broad language, the Senate adopted the current formulation of section 2(b), which provides international organizations the “same immunity ... as is enjoyed by foreign governments.” H.R. 4489, 79th Cong, (as reported by S. Comm, on Finance, Dec. 18,1945).
*710 The considered view of the Department of State, harking back to before Atkinson, is that the immunity of international organizations under the IOIA was not frozen as of 1945, but follows developments in the law of foreign sovereign immunity under the FSIA. In a 1980 letter, then-Legal Adviser Roberts Owen opined that, by “virtue of the FSIA, ... international organizations aré now subject to the jurisdiction of our courts in respect of their commercial activities.” Letter from Roberts B. Owen, Legal Adviser, U.S. Department of State, to Leroy D. Clark, General Counsel, Equal Employment Opportunity Commission (June 24, 1980), reprinted, in Marian L. Nash, Contemporary Practice of the United States Relating to International Law, 74 Am. J. Int’l L. 917, 917-18 (1980). Although the State Department’s interpretation of the IOIA is not binding on the court, the Department’s involvement in the drafting of the IOIA lends its view extra weight. See H.R. Rep. No. 79-1203, at 7 (1945) (referring to the draft bill as “prepared by the State Department”); see also Sosa v. Alvarez-Machain, 542 U.S. 692, 733 n.21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (citing a letter of the State Department’s Legal Adviser and encouraging courts to “give serious weight to the Executive Branch’s view” in cases that may affect foreign policy).
Reading the IOIA to dynamically link organizations’ immunity to that of their member states makes sense. The contrary view we adopted in Atkinson appears to allow states, subject to suit under the commercial activity exception of the FSIA, to carry on commercial activities with immunity through international organizations. Thus, the Canadian government is subject to suit in United States courts for disputes arising from its commercial activities here, but the Great Lakes Fishery Commission—of which the United States and Canada are the sole members—is immune from suit under Atkinson. See Exec. Order No. 11,059, 27 Fed. Reg. 10,405 (Oct. 23, 1962); see also Convention on Great Lakes Fisheries, Can.-U.S., Sept. 10, 1954, 6 U.S.T. 2836. Neither the IOIA nor our cases interpreting it explain why nations that collectively breach contracts or otherwise act unlawfully through organizations should enjoy immunity in our courts when the same conduct would not be immunized if directly committed by a nation acting on its own.
Were I not bound by Atkinson, I would hold that international organizations’ immunity under the IOIA is the same as the immunity enjoyed by foreign states. Accord OSS Nokalva, Inc. v. European Space Agency, 617 F.3d 756, 762-64 (3d Cir. 2010) (declining to follow Atkinson and holding that restricted immunity as codified in the FSIA, including its commercial activity exception, applies to international organizations under the IOIA).
2. Atkinson's, error is compounded in certain suits involving waiver under the Mendaro doctrine. In Mendaro v. World Bank, we decided that courts should pare back an international organization’s apparent waiver of immunity from suit whenever we believe the waiver would yield no “corresponding benefit” to the organization. 717 F.2d 610, 617 (D.C. Cir. 1983); see Osseiran v. Int’l Fin. Corp., 552 F.3d 836, 840 (D.C. Cir. 2009) (holding organization’s facially broad waiver of immunity effective only as to types of plaintiffs and claims that “would benefit the organization over the long term”). That doctrine lacks a sound legal foundation and is awkward to apply; were I not bound by precedent, I would reject it.
It is undisputed that IOIA immunity may be waived, 22 U.S.C. § 288a(b), and the majority recognizes that the IFC’s charter “would seem to include a categori *711 cal waiver.” Maj. Op. 706 & n.2; see IFC Articles of Agreement art. 6, § 3, May 25, 1955, 7 U.S.T. 2197, 264 U.N.T.S. 118. Half a century ago, we read the Agreement establishing the Inter-American Development Bank (IADB) to effectuate a broad waiver of the Bank’s immunity. See Lutcher S. A. Celulose e Papel v. Inter-American Development Bank, 382 F.2d 454, 457 (D.C. Cir. 1967) (Burger, J.). The IFC’s Articles of Agreement, which use the same waiver language as did the IADB in Luteher, would appear to waive the IFC’s immunity here. Under the reasoning of Luteher, the IFC, like the IADB in that case, may be sued in United States court.
But Luteher was not our last word. As just noted, we decided in Mendaro to hon- or an international organization’s “facially broad waiver of immunity” only insofar as doing so provided a “corresponding benefit” to the organization. 717 F.2d at 613, 617. We thought it appropriate to look to the “interrelationship between the functions” of the international organization and “the underlying purposes of international immunities” to cabin a charter document’s immunity waiver. Id. at 615. The member states, we opined in Mendaro, “could only have intended to waive the Bank’s immunity from suits by its debtors, creditors, bondholders, and those other potential plaintiffs to whom the Bank would have to subject itself to suit in order to achieve its chartered objectives.” Id. We decided the waiver did not apply to the claim of Men-daro, a former Bank employee challenging her termination, because recognizing employment claims had no “corresponding benefit” for the Bank. Id. at 612-14.
We saw Mendaro as distinguishable from Luteher. Allowing the debtor’s claims in Luteher “would directly aid the Bank in attracting responsible borrowers,” whereas complying with the law governing the Bank’s “internal operations” in Mendaro would not “appreciably advance the Bank’s ability to perform its functions.” Id. at 618-20 (emphasis omitted). In other words, Mendaro assumes that business counter-parties will be unwilling to transact with an international organization if they lack judicial recourse against it, but that making employees’ legal rights unenforceable against such an organization will not affect their willingness to work there. We thus held that a facially broad waiver of an organization’s immunity should be read not to allow employee claims.
The “corresponding benefit” doctrine calls on courts to second-guess international organizations’ own waiver decisions and to treat a waiver as inapplicable unless it would bring the organization a “corresponding benefit”—presumably one offsetting the burden of amenability to suit. The majority acknowledges that “it is a bit strange” that Mendaro calls on the judiciary to re-determine an international organization’s own waiver calculus. Op. at 707. I agree that the organization itself is in a better position than we are to know what is in its institutional interests. But, whereas my colleagues point to the fact that “the cases come to us when the organizations deny the claim,” id., I would be inclined to think that organizations’ assessments of their own long-term goals are more reliably reflected in their charters and policies—here, in the broad waiver included in IFC’s Articles of Agreement—than in their litigation positions defending against pending claims.
It is not entirely clear why we have drawn the particular line we have pursuant to Mendaro. Why are suits by a consultant, a potential investor, and a corporate borrower in an international organization’s interest, but suits by employees and their dependents not? Compare, e.g., Vila v. Inter-American Investment, Corp., 570 F.3d *712 274, 276, 279-82 (D.C. Cir. 2009) (permitting suit by a consultant); Osseiran, 552 F.3d at 840-41 (permitting suit by a potential investor); Lutcher, 382 F.2d at 459-60 (permitting suit by a corporate borrower), with, e.g., Atkinson, 156 F.3d at 1338-39 (barring suit by a former wife seeking garnishment of former husband’s wages); Mendaro, 717 F.2d at 618-19 (barring suit by a terminated employee asserting a sex harassment and discrimination claim).
Our cases seem to construe charter-document immunity waivers to allow suits only by commercial parties likely to be repeat players, or by parties with substantial bargaining power. But the opposite would make more sense: Entities doing regular business with international organizations can write waivers of immunity into their contracts with the organizations. See, e.g., OSS Nokalva, 617 F.3d at 759 (contract clause authorizing software developer to sue European Space Agency in state and federal courts in New Jersey). Sophisticated commercial actors that fail to bargain for such terms are surely less entitled to benefit from broad immunity waivers than victims of torts or takings who lacked any bargaining opportunity, or unsophisticated parties unlikely to anticipate and bargain around an immunity bar.
The IFC successfully argued here that it would enjoy no “corresponding benefit” from immunity waiver. The local entities and residents that brought this suit contend that .giving effect here to the IFC’s waiver would advance the Corporation’s organizational goals. The “IFC requires ‘broad community support’ before funding projects” like the Tata Mundra power plant, and “local communities may hesitate to host a high-risk project,” the appellants contend, “if.they know that the IFC can ignore its own promises and standards and they will have no recourse.” Appellants Br. at 48-49. Without directly addressing the benefits of legal accountability to the communities it seeks to serve, the IFC contends that treating the waiver in its Articles of Agreement as effective here would open a floodgate of litigation in United States courts. That argument has it backwards: The IFC persuaded the majority to stem a litigation flood it anticipates only because the immunity waiver in the IFC’s own Articles of Agreement opened the gate.
The perceived need for Mendaro’s odd approach would not have arisen if we had, back in Atkinson, read the IOIA to confer on international organizations the same immunity as is enjoyed by foreign governments—i.e. restrictive immunity that, today, would be governed by the FSIA. As the majority observes, Op. at 707, the cases in which we have applied Mendaro to hold that claims are not immunity-barred look remarkably like cases that would be allowed to proceed under the FSIA’s commercial activity exception. The activities we held to be non-immunized— such as suits by “debtors, creditors, [and] bondholders,” Mendaro, 717 F.2d at 615, “suits based on commercial transactions with the outside world” affecting an organization’s “ability to operate in the marketplace,” Osseiran, 552 F.3d at 840, and unjust enrichment claims by commercial lending specialists, Vila, 570 F.3d at 276, 279-82—seem like just the kinds of claims that would be permitted under the commercial activity exception. We should have achieved that result, not via Mendaro’s “corresponding benefit” test, but by recognizing that the IOIA hitched the scope of international organizations’ immunity to that of foreign governments under the FSIA. There is a time-tested body of law under the FSIA that delineates its contours—including its commercial activity exception. The pattern of decisions applying Mendaro may approximate some of the results that would have occurred had in *713 ternational organizations been subject to the FSIA, but Mendaro begs other important questions that assimilation of IOIA immunity to the FSIA would resolve.
Our efforts to chart a separate course under the IOIA were misguided from the start, and the doctrinal tangle has only deepened in light of the amorphous waiver-curbing doctrine that has developed under Mendaro. I believe that the full court should revisit both Atkinson and Mendaro in an appropriate case. But because those decisions remain binding precedent in our circuit, I concur.