7/16/2019 12:42:01 PM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **17-1011.pdf** | versus | **17-1011_new.pdf** |
| **36 pages (184 KB)** | | **36 pages (200 KB)** |
| 2/26/2019 8:55:58 AM | | 7/16/2019 12:39:52 PM |

| Total Changes | Content | | Styling and Annotations | |
|---|---|---|---|---|
| **1** | 0 | Replacements | 0 | Styling |
| | 1 | Insertion | 0 | Annotations |
| | 0 | Deletions | | |

**Go to First Change (page 20)**

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JAM ET AL. *v.* INTERNATIONAL FINANCE CORP.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 17–1011. Argued October 31, 2018—Decided February 27, 2019

In 1945, Congress passed the International Organizations Immunities Act (IOIA), which, among other things, grants international organizations the "same immunity from suit . . . as is enjoyed by foreign governments." 22 U. S. C. §288a(b). At that time, foreign governments were entitled to virtually absolute immunity as a matter of international grace and comity. In 1952, the State Department adopted a more restrictive theory of foreign sovereign immunity, which Congress subsequently codified in the Foreign Sovereign Immunities Act (FSIA), 28 U. S. C. §1602. The FSIA gives foreign sovereign governments presumptive immunity from suit, §1604, subject to several statutory exceptions, including, as relevant here, an exception for actions based on commercial activity with a sufficient nexus with the United States, §1605(a)(2).

Respondent International Finance Corporation (IFC), an IOIA international organization, entered into a loan agreement with Coastal Gujarat Power Limited, a company based in India, to finance the construction of a coal-fired power plant in Gujarat. Petitioners sued the IFC, claiming that pollution from the plant harmed the surrounding air, land, and water. The District Court, however, held that the IFC was immune from suit because it enjoyed the virtually absolute immunity that foreign governments enjoyed when the IOIA was enacted. The D. C. Circuit affirmed in light of its decision in *Atkinson* v. *Inter-American Development Bank*, 156 F. 3d 1335.

*Held*: The IOIA affords international organizations the same immunity from suit that foreign governments enjoy today under the FSIA. Pp. 6–15.

   (a) The IOIA "same as" formulation is best understood as making international organization immunity and foreign sovereign immunity

continuously equivalent. The IOIA is thus like other statutes that use similar or identical language to place two groups on equal footing. See, *e.g.*, Civil Rights Act of 1866, 42 U. S. C. §§1981(a), 1982; Federal Tort Claims Act, 28 U. S. C. §2674. Whatever the ultimate purpose of international organization immunity may be, the immediate purpose of the IOIA immunity provision is expressed in language that Congress typically uses to make one thing continuously equivalent to another. Pp. 6–9.

(b) That reading is confirmed by the "reference canon" of statutory interpretation. When a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises. In contrast, when a statute refers to another statute by specific title, the referenced statute is adopted as it existed when the referring statute was enacted, without any subsequent amendments. Federal courts have often relied on the reference canon to harmonize a statute with an external body of law that the statute refers to generally. The IOIA's reference to the immunity enjoyed by foreign governments is to an external body of potentially evolving law, not to a specific provision of another statute. Nor is it a specific reference to a common law concept with a fixed meaning. The phrase "immunity enjoyed by foreign governments" is not a term of art with substantive content but rather a concept that can be given scope and content only by reference to the rules governing foreign sovereign immunity. Pp. 9–11.

(c) The D. C. Circuit relied upon *Atkinson*'s conclusion that the reference canon's probative force was outweighed by an IOIA provision authorizing the President to alter the immunity of an international organization. But the fact that the President has power to modify otherwise applicable immunity rules is perfectly compatible with the notion that those rules might themselves change over time in light of developments in the law governing foreign sovereign immunity. The *Atkinson* court also did not consider the opinion of the State Department, whose views in this area ordinarily receive "special attention," *Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*, 581 U. S. ___, ___, and which took the position that immunity rules of the IOIA and the FSIA were linked following the FSIA's enactment. Pp. 11–13.

(d) The IFC contends that interpreting the IOIA immunity provision to grant only restrictive immunity would defeat the purpose of granting immunity in the first place, by subjecting international organizations to suit under the commercial activity exception of the FSIA for most or all of their core activities. This would be particularly true with respect to international development banks, which use the tools of commerce to achieve their objectives. Those concerns are

Syllabus

inflated. The IOIA provides only default rules. An international organization's charter can always specify a different level of immunity, and many do. Nor is it clear that the lending activity of all development banks qualifies as commercial activity within the meaning of the FSIA. But even if it does qualify as commercial, that does not mean the organization is automatically subject to suit, since other FSIA requirements must also be met, see, *e.g.*, 28 U. S. C. §§1603, 1605(a)(2). Pp. 13–15.

860 F. 3d 703, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, GINSBURG, ALITO, SOTOMAYOR, KAGAN, and GORSUCH, JJ., joined. BREYER, J., filed a dissenting opinion. KAVANAUGH, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–1011

### BUDHA ISMAIL JAM, ET AL., PETITIONERS *v.* INTERNATIONAL FINANCE CORPORATION

#### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[February 27, 2019]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The International Organizations Immunities Act of 1945 grants international organizations such as the World Bank and the World Health Organization the "same immunity from suit . . . as is enjoyed by foreign governments." 22 U. S. C. §288a(b). At the time the IOIA was enacted, foreign governments enjoyed virtually absolute immunity from suit. Today that immunity is more limited. Most significantly, foreign governments are not immune from actions based upon certain kinds of commercial activity in which they engage. This case requires us to determine whether the IOIA grants international organizations the virtually absolute immunity foreign governments enjoyed when the IOIA was enacted, or the more limited immunity they enjoy today.

Respondent International Finance Corporation is an international organization headquartered in the United States. The IFC finances private-sector development projects in poor and developing countries around the world. About 10 years ago, the IFC financed the construc-

tion of a power plant in Gujarat, India. Petitioners are local farmers and fishermen and a small village. They allege that the power plant has polluted the air, land, and water in the surrounding area. Petitioners sued the IFC for damages and injunctive relief in Federal District Court, but the IFC claimed absolute immunity from suit. Petitioners argued that the IFC was entitled under the IOIA only to the limited or "restrictive" immunity that foreign governments currently enjoy. We agree.

## I
## A

In the wake of World War II, the United States and many of its allies joined together to establish a host of new international organizations. Those organizations, which included the United Nations, the International Monetary Fund, and the World Bank, were designed to allow member countries to collectively pursue goals such as stabilizing the international economy, rebuilding war-torn nations, and maintaining international peace and security.

Anticipating that those and other international organizations would locate their headquarters in the United States, Congress passed the International Organizations Immunities Act of 1945, 59 Stat. 669. The Act grants international organizations a set of privileges and immunities, such as immunity from search and exemption from property taxes. 22 U. S. C. §§288a(c), 288c.

The IOIA defines certain privileges and immunities by reference to comparable privileges and immunities enjoyed by foreign governments. For example, with respect to customs duties and the treatment of official communications, the Act grants international organizations the privileges and immunities that are "accorded under similar circumstances to foreign governments." §288a(d). The provision at issue in this case provides that international organizations "shall enjoy the same immunity from suit

and every form of judicial process as is enjoyed by foreign governments." §288a(b).

The IOIA authorizes the President to withhold, withdraw, condition, or limit the privileges and immunities it grants in light of the functions performed by any given international organization. §288. Those privileges and immunities can also be expanded or restricted by a particular organization's founding charter.

## B

When the IOIA was enacted in 1945, courts looked to the views of the Department of State in deciding whether a given foreign government should be granted immunity from a particular suit. If the Department submitted a recommendation on immunity, courts deferred to the recommendation. If the Department did not make a recommendation, courts decided for themselves whether to grant immunity, although they did so by reference to State Department policy. *Samantar* v. *Yousuf*, 560 U. S. 305, 311–312 (2010).

Until 1952, the State Department adhered to the classical theory of foreign sovereign immunity. According to that theory, foreign governments are entitled to "virtually absolute" immunity as a matter of international grace and comity. At the time the IOIA was enacted, therefore, the Department ordinarily requested, and courts ordinarily granted, immunity in suits against foreign governments. *Ibid.*; *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983).[1]

In 1952, however, the State Department announced that it would adopt the newer "restrictive" theory of foreign

---

[1] The immunity was "virtually" absolute because it was subject to occasional exceptions for specific situations. In *Republic of Mexico* v. *Hoffman*, 324 U. S. 30 (1945), for example, the State Department declined to recommend, and the Court did not grant, immunity from suit with respect to a ship that Mexico owned but did not possess.

sovereign immunity. Under that theory, foreign governments are entitled to immunity only with respect to their sovereign acts, not with respect to commercial acts. The State Department explained that it was adopting the restrictive theory because the "widespread and increasing practice on the part of governments of engaging in commercial activities" made it "necessary" to "enable persons doing business with them to have their rights determined in the courts." Letter from Jack B. Tate, Acting Legal Adviser, Dept. of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. State Bull. 984–985 (1952).

In 1976, Congress passed the Foreign Sovereign Immunities Act. The FSIA codified the restrictive theory of foreign sovereign immunity but transferred "primary responsibility for immunity determinations from the Executive to the Judicial Branch." *Republic of Austria* v. *Altmann*, 541 U. S. 677, 691 (2004); see 28 U. S. C. §1602. Under the FSIA, foreign governments are presumptively immune from suit. §1604. But a foreign government may be subject to suit under one of several statutory exceptions. Most pertinent here, a foreign government may be subject to suit in connection with its commercial activity that has a sufficient nexus with the United States. §1605(a)(2).

C

The International Finance Corporation is an international development bank headquartered in Washington, D. C. The IFC is designated as an international organization under the IOIA. Exec. Order No. 10680, 3 CFR 86 (1957); see 22 U. S. C. §§282, 288. One hundred eighty-four countries, including the United States, are members of the IFC.

The IFC is charged with furthering economic development "by encouraging the growth of productive private enterprise in member countries, particularly in the less

developed areas, thus supplementing the activities of" the World Bank. Articles of Agreement of the International Finance Corporation, Art. I, Dec. 5, 1955, 7 U. S. T. 2193, T. I. A. S. No. 3620. Whereas the World Bank primarily provides loans and grants to developing countries for public-sector projects, the IFC finances private-sector development projects that cannot otherwise attract capital on reasonable terms. See Art. I(i), *ibid*. In 2018, the IFC provided some $23 billion in such financing.

The IFC expects its loan recipients to adhere to a set of performance standards designed to "avoid, mitigate, and manage risks and impacts" associated with development projects. IFC Performance Standards on Environmental and Social Sustainability, Jan. 1, 2012, p. 2, ¶1. Those standards are usually more stringent than any established by local law. The IFC includes the standards in its loan agreements and enforces them through an internal review process. Brief for Respondent 10.

In 2008, the IFC loaned $450 million to Coastal Gujarat Power Limited, a company located in India. The loan helped finance the construction of a coal-fired power plant in the state of Gujarat. Under the terms of the loan agreement, Coastal Gujarat was required to comply with an environmental and social action plan designed to protect areas around the plant from damage. The agreement allowed the IFC to revoke financial support for the project if Coastal Gujarat failed to abide by the terms of the agreement.

The project did not go smoothly. According to the IFC's internal audit, Coastal Gujarat did not comply with the environmental and social action plan in constructing and operating the plant. The audit report criticized the IFC for inadequately supervising the project.

In 2015, a group of farmers and fishermen who live near the plant, as well as a local village, sued the IFC in the United States District Court for the District of Columbia.

They claimed that pollution from the plant, such as coal dust, ash, and water from the plant's cooling system, had destroyed or contaminated much of the surrounding air, land, and water. Relying on the audit report, they asserted several causes of action against the IFC, including negligence, nuisance, trespass, and breach of contract. The IFC maintained that it was immune from suit under the IOIA and moved to dismiss for lack of subject matter jurisdiction.

The District Court, applying D. C. Circuit precedent, concluded that the IFC was immune from suit because the IOIA grants international organizations the virtually absolute immunity that foreign governments enjoyed when the IOIA was enacted. 172 F. Supp. 3d 104, 108–109 (DC 2016) (citing *Atkinson* v. *Inter-American Development Bank*, 156 F. 3d 1335 (CADC 1998)). The D. C. Circuit affirmed in light of its precedent. 860 F. 3d 703 (2017). Judge Pillard wrote separately to say that she would have decided the question differently were she writing on a clean slate. *Id.*, at 708 (concurring opinion). Judge Pillard explained that she thought the D. C. Circuit "took a wrong turn" when it "read the IOIA to grant international organizations a static, absolute immunity that is, by now, not at all the same 'as is enjoyed by foreign governments,' but substantially broader." *Ibid.* Judge Pillard also noted that the Third Circuit had expressly declined to follow the D. C. Circuit's approach. See *OSS Nokalva, Inc.* v. *European Space Agency*, 617 F. 3d 756 (CA3 2010).

We granted certiorari. 584 U. S. ___ (2018).

## II

The IFC contends that the IOIA grants international organizations the "same immunity" from suit that foreign governments enjoyed in 1945. Petitioners argue that it instead grants international organizations the "same immunity" from suit that foreign governments enjoy to-

day. We think petitioners have the better reading of the statute.

## A

The language of the IOIA more naturally lends itself to petitioners' reading. In granting international organizations the "same immunity" from suit "as is enjoyed by foreign governments," the Act seems to continuously link the immunity of international organizations to that of foreign governments, so as to ensure ongoing parity between the two. The statute could otherwise have simply stated that international organizations "shall enjoy absolute immunity from suit," or specified some other fixed level of immunity. Other provisions of the IOIA, such as the one making the property and assets of international organizations "immune from search," use such noncomparative language to define immunities in a static way. 22 U. S. C. §288a(c). Or the statute could have specified that it was incorporating the law of foreign sovereign immunity as it existed on a particular date. See, *e.g.*, Energy Policy Act of 1992, 30 U. S. C. §242(c)(1) (certain land patents "shall provide for surface use to the same extent as is provided under applicable law prior to October 24, 1992"). Because the IOIA does neither of those things, we think the "same as" formulation is best understood to make international organization immunity and foreign sovereign immunity continuously equivalent.

That reading finds support in other statutes that use similar or identical language to place two groups on equal footing. In the Civil Rights Act of 1866, for instance, Congress established a rule of equal treatment for newly freed slaves by giving them the "same right" to make and enforce contracts and to buy and sell property "as is enjoyed by white citizens." 42 U. S. C. §§1981(a), 1982. That provision is of course understood to guarantee continuous equality between white and nonwhite citizens with respect

to the rights in question. See *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 427–430 (1968). Similarly, the Federal Tort Claims Act states that the "United States shall be liable" in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U. S. C. §2674. That provision is most naturally understood to make the United States liable in the same way as a private individual at any given time. See *Richards* v. *United States*, 369 U. S. 1, 6–7 (1962). Such "same as" provisions dot the statute books, and federal and state courts commonly read them to mandate ongoing equal treatment of two groups or objects. See, *e.g.*, *Adamson* v. *Bowen*, 855 F. 2d 668, 671–672 (CA10 1988) (statute making United States liable for fees and expenses "to the same extent that any other party would be liable under the common law or under the terms of any statute" interpreted to continuously tie liability of United States to that of any other party); *Kugler's Appeal*, 55 Pa. 123, 124–125 (1867) (statute making the procedure for dividing election districts "the same as" the procedure for dividing townships interpreted to continuously tie the former procedure to the latter).

The IFC objects that the IOIA is different because the purpose of international organization immunity is entirely distinct from the purpose of foreign sovereign immunity. Foreign sovereign immunity, the IFC argues, is grounded in the mutual respect of sovereigns and serves the ends of international comity and reciprocity. The purpose of international organization immunity, on the other hand, is to allow such organizations to freely pursue the collective goals of member countries without undue interference from the courts of any one member country. The IFC therefore urges that the IOIA should not be read to tether international organization immunity to changing foreign sovereign immunity.

But that gets the inquiry backward. We ordinarily

assume, "absent a clearly expressed legislative intention to the contrary," that "the legislative purpose is expressed by the ordinary meaning of the words used." *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 68 (1982) (alterations omitted). Whatever the ultimate purpose of international organization immunity may be—the IOIA does not address that question—the immediate purpose of the immunity provision is expressed in language that Congress typically uses to make one thing continuously equivalent to another.

B

The more natural reading of the IOIA is confirmed by a canon of statutory interpretation that was well established when the IOIA was drafted. According to the "reference" canon, when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises. 2 J. Sutherland, Statutory Construction §§5207–5208 (3d ed. 1943). For example, a statute allowing a company to "collect the same tolls and enjoy the same privileges" as other companies incorporates the law governing tolls and privileges as it exists at any given moment. *Snell* v. *Chicago*, 133 Ill. 413, 437–439, 24 N. E. 532, 537 (1890). In contrast, a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments. See, *e.g.*, *Culver* v. *People ex rel. Kochersperger*, 161 Ill. 89, 95–99, 43 N. E. 812, 814–815 (1896) (tax-assessment statute referring to specific article of another statute does not adopt subsequent amendments to that article).

Federal courts have often relied on the reference canon, explicitly or implicitly, to harmonize a statute with an external body of law that the statute refers to generally. Thus, for instance, a statute that exempts from disclosure

agency documents that "would not be *available by law* to a party . . . in litigation with the agency" incorporates the general law governing attorney work-product privilege as it exists when the statute is applied. *FTC* v. *Grolier Inc.*, 462 U. S. 19, 20, 26–27 (1983) (emphasis added); *id.*, at 34, n. 6 (Brennan, J., concurring in part and concurring in judgment). Likewise, a general reference to federal discovery rules incorporates those rules "as they are found on any given day, today included," *El Encanto, Inc.* v. *Hatch Chile Co.*, 825 F. 3d 1161, 1164 (CA10 2016), and a general reference to "the crime of piracy as defined by the law of nations" incorporates a definition of piracy "that changes with advancements in the law of nations," *United States* v. *Dire*, 680 F. 3d 446, 451, 467–469 (CA4 2012).

The same logic applies here. The IOIA's reference to the immunity enjoyed by foreign governments is a general rather than specific reference. The reference is to an external body of potentially evolving law—the law of foreign sovereign immunity—not to a specific provision of another statute. The IOIA should therefore be understood to link the law of international organization immunity to the law of foreign sovereign immunity, so that the one develops in tandem with the other.

The IFC contends that the IOIA's reference to the immunity enjoyed by foreign governments is not a general reference to an external body of law, but is instead a specific reference to a common law concept that had a fixed meaning when the IOIA was enacted in 1945. And because we ordinarily presume that "Congress intends to incorporate the well-settled meaning of the common-law terms it uses," *Neder* v. *United States*, 527 U. S. 1, 23 (1999), the IFC argues that we should read the IOIA to incorporate what the IFC maintains was the then-settled meaning of the "immunity enjoyed by foreign governments": virtually absolute immunity.

But in 1945, the "immunity enjoyed by foreign govern-

ments" did not *mean* "virtually absolute immunity." The phrase is not a term of art with substantive content, such as "fraud" or "forgery." See *id.*, at 22; *Gilbert* v. *United States*, 370 U. S. 650, 655 (1962). It is rather a concept that can be given scope and content only by reference to the rules governing foreign sovereign immunity. It is true that under the rules applicable in 1945, the *extent* of immunity from suit was virtually absolute, while under the rules applicable today, it is more limited. But in 1945, as today, the IOIA's instruction to grant international organizations the immunity "enjoyed by foreign governments" is an instruction to look up the applicable rules of foreign sovereign immunity, wherever those rules may be found— the common law, the law of nations, or a statute. In other words, it is a general reference to an external body of (potentially evolving) law.

## C

In ruling for the IFC, the D. C. Circuit relied upon its prior decision in *Atkinson*, 156 F. 3d 1335. *Atkinson* acknowledged the reference canon, but concluded that the canon's probative force was "outweighed" by a structural inference the court derived from the larger context of the IOIA. *Id.*, at 1341. The *Atkinson* court focused on the provision of the IOIA that gives the President the authority to withhold, withdraw, condition, or limit the otherwise applicable privileges and immunities of an international organization, "in the light of the functions performed by any such international organization." 22 U. S. C. §288. The court understood that provision to "delegate to the President the responsibility for updating the immunities of international organizations in the face of changing circumstances." *Atkinson*, 156 F. 3d, at 1341. That delegation, the court reasoned, "undermine[d]" the view that Congress intended the IOIA to in effect update itself by incorporating changes in the law governing foreign sover-

eign immunity. *Ibid.*

We do not agree. The delegation provision is most naturally read to allow the President to modify, on a case-by-case basis, the immunity rules that would otherwise apply to a particular international organization. The statute authorizes the President to take action with respect to a single organization—"any such organization"— in light of the functions performed by "such organization." 28 U. S. C. §288. The text suggests retail rather than wholesale action, and that is in fact how authority under §288 has been exercised in the past. See, *e.g.*, Exec. Order No. 12425, 3 CFR 193 (1984) (designating INTERPOL as an international organization under the IOIA but withholding certain privileges and immunities); Exec. Order No. 11718, 3 CFR 177 (1974) (same for INTELSAT). In any event, the fact that the President has power to modify otherwise applicable immunity rules is perfectly compatible with the notion that those rules might themselves change over time in light of developments in the law governing foreign sovereign immunity.

The D. C. Circuit in *Atkinson* also gave no consideration to the opinion of the State Department, whose views in this area ordinarily receive "special attention." *Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l. Drilling Co.*, 581 U. S. ___, ___ (2017) (slip op., at 9). Shortly after the FSIA was enacted, the State Department took the position that the immunity rules of the IOIA and the FSIA were now "link[ed]." Letter from Detlev F. Vagts, Office of the Legal Adviser, to Robert M. Carswell, Jr., Senior Legal Advisor, OAS, p. 2 (Mar. 24, 1977). The Department reaffirmed that view during subsequent administrations, and it has reaffirmed it again here.[2] That longstanding

---

[2] See Letter from Roberts B. Owen, Legal Adviser, to Leroy D. Clark, Gen. Counsel, EEOC (June 24, 1980) in Nash, Contemporary Practice of the United States Relating to International Law, 74 Am. J. Int'l. L. 917,

view further bolsters our understanding of the IOIA's immunity provision.

D

The IFC argues that interpreting the IOIA's immunity provision to grant anything less than absolute immunity would lead to a number of undesirable results.

The IFC first contends that affording international organizations only restrictive immunity would defeat the purpose of granting them immunity in the first place. Allowing international organizations to be sued in one member country's courts would in effect allow that member to second-guess the collective decisions of the others. It would also expose international organizations to money damages, which would in turn make it more difficult and expensive for them to fulfill their missions. The IFC argues that this problem is especially acute for international development banks. Because those banks use the tools of commerce to achieve their objectives, they may be subject to suit under the FSIA's commercial activity exception for most or all of their core activities, unlike foreign sovereigns. According to the IFC, allowing such suits would bring a flood of foreign-plaintiff litigation into U. S. courts, raising many of the same foreign-relations con-

———————

918 (1980) ("By virtue of the FSIA, and unless otherwise specified in their constitutive agreements, international organizations are now subject to the jurisdiction of our courts in respect of their commercial activities, while retaining immunity for their acts of a public character."); Letter from Arnold Kanter, Acting Secretary of State, to President George H. W. Bush (Sept. 12, 1992) in Digest of United States Practice in International Law 1016–1017 (S. Cummins & D. Stewart eds. 2005) (explaining that the Headquarters Agreement of the Organization of American States affords the OAS "full immunity from judicial process, thus going beyond the usual United States practice of affording restrictive immunity," in exchange for assurances that OAS would provide for "appropriate modes of settlement of those disputes for which jurisdiction would exist against a foreign government under the" FSIA); Brief for United States as *Amicus Curiae* 24–29.

cerns that we identified when considering similar litiga-
tion under the Alien Tort Statute. See *Jesner* v. *Arab
Bank, PLC*, 584 U. S. ___, ___–___ (2018); *Kiobel* v. *Royal
Dutch Petroleum Co.*, 569 U. S. 108, 116–117 (2013).

  The IFC's concerns are inflated. To begin, the privileges
and immunities accorded by the IOIA are only default
rules. If the work of a given international organization
would be impaired by restrictive immunity, the organiza-
tion's charter can always specify a different level of im-
munity. The charters of many international organizations
do just that. See, *e.g.*, Convention on Privileges and Im-
munities of the United Nations, Art. II, §2, Feb. 13, 1946,
21 U. S. T. 1422, T. I. A. S. No. 6900 ("The United Nations
. . . shall enjoy immunity from every form of legal process
except insofar as in any particular case it has expressly
waived its immunity"); Articles of Agreement of the Inter-
national Monetary Fund, Art. IX, §3, Dec. 27, 1945, 60
Stat. 1413, T. I. A. S. No. 1501 (IMF enjoys "immunity
from every form of judicial process except to the extent
that it expressly waives its immunity"). Notably, the
IFC's own charter does not state that the IFC is absolutely
immune from suit.

  Nor is there good reason to think that restrictive im-
munity would expose international development banks to
excessive liability. As an initial matter, it is not clear that
the lending activity of all development banks qualifies as
commercial activity within the meaning of the FSIA. To
be considered "commercial," an activity must be "the *type*"
of activity "by which a private party engages in" trade or
commerce. *Republic of Argentina* v. *Weltover, Inc.*, 504
U. S. 607, 614 (1992); see 28 U. S. C. §1603(d). As the
Government suggested at oral argument, the lending
activity of at least some development banks, such as those
that make conditional loans to governments, may not
qualify as "commercial" under the FSIA. See Tr. of Oral
Arg. 27–30.

And even if an international development bank's lending activity does qualify as commercial, that does not mean the organization is automatically subject to suit. The FSIA includes other requirements that must also be met. For one thing, the commercial activity must have a sufficient nexus to the United States. See 28 U. S. C. §§1603, 1605(a)(2). For another, a lawsuit must be "based upon" either the commercial activity itself or acts performed in connection with the commercial activity. See §1605(a)(2). Thus, if the "gravamen" of a lawsuit is tortious activity abroad, the suit is not "based upon" commercial activity within the meaning of the FSIA's commercial activity exception. See *OBB Personenverkehr AG* v. *Sachs*, 577 U. S. \_\_\_, \_\_\_–\_\_\_ (2015); *Saudi Arabia* v. *Nelson*, 507 U. S. 349, 356–359 (1993). At oral argument in this case, the Government stated that it has "serious doubts" whether petitioners' suit, which largely concerns allegedly tortious conduct in India, would satisfy the "based upon" requirement. Tr. of Oral Arg. 25–26. In short, restrictive immunity hardly means unlimited exposure to suit for international organizations.

*          *          *

The International Organizations Immunities Act grants international organizations the "same immunity" from suit "as is enjoyed by foreign governments" at any given time. Today, that means that the Foreign Sovereign Immunities Act governs the immunity of international organizations. The International Finance Corporation is therefore not absolutely immune from suit.

The judgment of the United States Court of Appeals for the D. C. Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Opinion of the Court

JUSTICE KAVANAUGH took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

———————

No. 17–1011

———————

BUDHA ISMAIL JAM, ET AL., PETITIONERS *v.*
INTERNATIONAL FINANCE CORPORATION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[February 27, 2019]

JUSTICE BREYER, dissenting.

The International Organizations Immunities Act of 1945 extends to international organizations "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments." 22 U. S. C. §288a(b). The majority, resting primarily upon the statute's language and canons of interpretation, holds that the statute's reference to "immunity" moves with the times. As a consequence, the statute no longer allows international organizations immunity from lawsuits arising from their commercial activities. In my view, the statute grants international organizations that immunity—just as foreign governments possessed that immunity when Congress enacted the statute in 1945. In reaching this conclusion, I rest more heavily than does the majority upon the statute's history, its context, its purposes, and its consequences. And I write in part to show that, in difficult cases like this one, purpose-based methods of interpretation can often shine a useful light upon opaque statutory language, leading to a result that reflects greater legal coherence and is, as a practical matter, more likely to prove sound.

## I

The general question before us is familiar: Do the words of a statute refer to their subject matter "statically," as it

was when the statute was written?  Or is their reference
to that subject matter "dynamic," changing in scope as the
subject matter changes over time?  It is hardly surprising,
given the thousands of different statutes containing an
untold number of different words, that there is no single,
universally applicable answer to this question.

Fairly recent cases from this Court make that clear.
Compare *New Prime Inc.* v. *Oliveira*, 586 U. S. ___, ___
(2019) (slip op., at 7) (adopting the interpretation of "'con-
tracts of employment'" that prevailed at the time of the
statute's adoption in 1925); *Wisconsin Central Ltd.* v.
*United States*, 585 U. S. ___, ___ (2018) (slip op., at 2)
(adopting the meaning of "'money'" that prevailed at the
time of the statute's enactment in 1937); *Carcieri* v. *Sala-
zar*, 555 U. S. 379, 388 (2009) (interpreting the statutory
phrase "'now under Federal jurisdiction'" to cover only
those tribes that were under federal jurisdiction at the
time of the statute's adoption in 1934); and *Republic of
Argentina* v. *Weltover, Inc.*, 504 U. S. 607, 612–613 (1992)
(adopting the meaning of "'commercial'" that was "at-
tached to that term under the restrictive theory" when the
Foreign Sovereign Immunities Act was enacted in 1976),
with *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. ___,
___ (2015) (slip op., at 14) (noting that the words "'re-
straint of trade'" in the Sherman Act have been interpreted
dynamically); *West* v. *Gibson*, 527 U. S. 212, 218 (1999)
(interpreting the term "'appropriate'" in Title VII's reme-
dies provision dynamically); and *Allied-Bruce Terminix
Cos.* v. *Dobson*, 513 U. S. 265, 275–276 (1995) (interpret-
ing the term "'involving commerce'" in the Federal Arbi-
tration Act dynamically).

The Court, like petitioners, believes that the language of
the statute itself helps significantly to answer the stat-
ic/dynamic question.  See *ante*, at 7–9.  I doubt that the
language itself helps in this case.  Petitioners point to the
words "as is" in the phrase that grants the international

organizations the "same immunity from suit . . . *as is* enjoyed by foreign governments." Brief for Petitioners 23–24. They invoke the Dictionary Act, which states that "words used in the present tense include the future" "unless the context indicates otherwise." 1 U. S. C. §1. But that provision creates only a presumption. And it did not even appear in the statute until 1948, *after* Congress had passed the Immunities Act. Compare §1, 61 Stat. 633, with §6, 62 Stat. 859.

More fundamentally, the words "as is enjoyed" do not conclusively tell us *when* enjoyed. Do they mean "as is enjoyed" at the time of the statute's enactment? Or "as is enjoyed" at the time a plaintiff brings a lawsuit? If the former, international organizations enjoy immunity from lawsuits based upon their commercial activities, for that was the scope of immunity that foreign governments enjoyed in 1945 when the Immunities Act became law. If the latter, international organizations do not enjoy that immunity, for foreign governments can no longer claim immunity from lawsuits based upon certain commercial activities. See 28 U. S. C. §1605(a)(2).

Linguistics does not answer the temporal question. Nor do our cases, which are not perfectly consistent on the matter. Compare *McNeill* v. *United States*, 563 U. S. 816, 821 (2011) (present-tense verb in the Armed Career Criminal Act requires applying the law at the time of previous conviction, not the later time when the Act is applied), with *Dole Food Co.* v. *Patrickson*, 538 U. S. 468, 478 (2003) (present-tense verb requires applying the law "at the time suit is filed"). The problem is simple: "Without knowing the point in time at which the law speaks, it is impossible to tell what is past and what is present or future." *Carr* v. *United States*, 560 U. S. 438, 463 (2010) (ALITO, J., dissenting). It is *purpose*, not linguistics, that can help us here.

The words "same . . . as," in the phrase "same immunity

. . . as," provide no greater help. The majority finds support for its dynamic interpretation in the Civil Rights Act of 1866, which gives all citizens the "*same* right" to make and enforce contracts and to buy and sell property "*as* is enjoyed by white citizens." 42 U. S. C. §§1981(a), 1982 (emphasis added). But it is *purpose*, not words, that readily resolves any temporal linguistic ambiguity in that statute. The Act's objective, like that of the Fourteenth Amendment itself, was a Nation that treated its citizens equally. Its purpose—revealed by its title, historical context, and other language in the statute—was "to guarantee the then newly freed slaves the same legal rights that other citizens enjoy." *CBOCS West, Inc.* v. *Humphries*, 553 U. S. 442, 448 (2008). Given this purpose, its dynamic nature is obvious.

Similarly, judges interpreting the words "same . . . as" have long resolved ambiguity not by looking at the words alone, but by examining the statute's purpose as well. Compare, *e.g.*, *Kugler's Appeal*, 55 Pa. 123, 123–125 (1867) (adopting a dynamic interpretation of "same as" statute in light of "plain" and "manifest" statutory purpose); and *Gaston* v. *Lamkin*, 115 Mo. 20, 34, 21 S. W. 1100, 1104 (1893) (adopting a dynamic interpretation of "same as" election statute given the legislature's intent to achieve "simplicity and uniformity in the conduct of elections"), with *O'Flynn* v. *East Rochester*, 292 N. Y. 156, 162, 54 N. E. 2d 343, 346 (1944) (adopting a static interpretation of "same as" statute given that the legislature "did not contemplate" that subsequent changes to a referenced statute would apply (interpreting N. Y. Gen. Mun. Law Ann. §360(5) (West 1934))). There is no hard-and-fast rule that the statutory words "as is" or the statutory words "same as" require applying the law as it stands today.

The majority wrongly believes that it can solve the temporal problem by bringing statutory canons into play. It relies on what it calls the "reference canon." That canon,

as it appeared more than 75 years ago in Sutherland's book on statutory construction, says that "when a statute refers to a general subject, the statute adopts the law on that subject as it exists *whenever a question under the statute arises." Ante*, at 9 (citing 2 J. Sutherland, Statutory Construction §§5207–5208 (3d ed. 1943); emphasis added).

But a canon is at most a rule of thumb. Indeed, Sutherland himself says that "[n]o single canon of interpretation can purport to give a certain and unerring answer." 2 Sutherland, *supra*, §4501, p. 316. And hornbooks, summarizing case law, have long explained that whether a reference statute adopts the law as it stands on the date of enactment or includes subsequent changes in the law to which it refers is "fundamentally a question of legislative intent and purpose." Fox, Effect of Modification or Repeal of Constitutional or Statutory Provision Adopted by Reference in Another Provision, 168 A. L. R. 627, 628 (1947); see also 82 C. J. S., Statutes §485, p. 637 (2009) ("The question of whether a statute which has adopted another statute by reference will be affected by amendments made to the adopted statute is one of legislative intent and purpose"); *id.*, at 638 (statute that refers generally to another body of law will ordinarily include subsequent changes in the adopted law only "as far as the changes are consistent with the purpose of the adopting statute").

Thus, all interpretive roads here lead us to the same place, namely, to context, to history, to purpose, and to consequences. Language alone cannot resolve the statute's linguistic ambiguity.

## II

"Statutory interpretation," however, "is not a game of blind man's bluff." *Dole Food Co.*, 538 U. S., at 484 (BREYER, J., concurring in part and dissenting in part). We are "free to consider statutory language in light of a

statute's basic purposes," *ibid.*, as well as "'the history of the times when it was passed,'" *Leo Sheep Co.* v. *United States*, 440 U. S. 668, 669 (1979) (quoting *United States* v. *Union Pacific R. Co.*, 91 U. S. 72, 79 (1875)). In this case, historical context, purpose, and related consequences tell us a great deal about the proper interpretation of the Immunities Act.

Congressional reports explain that Congress, acting in the immediate aftermath of World War II, intended the Immunities Act to serve two related purposes. First, it would "enabl[e] this country to fulfill its commitments in connection with its membership in international organizations." S. Rep. No. 861, 79th Cong., 1st Sess., 3 (1945); see also *id.*, at 2–3 (explaining that the Immunities Act was "basic legislation" expected to "satisfy in full the requirements of . . . international organizations conducting activities in the United States"); H. R. Rep. No. 1203, 79th Cong., 1st Sess., 3 (1945) (similar). And second, it would "facilitate fully the functioning of international organizations in this country." S. Rep. No. 861, at 3.

A

I first examine the international commitments that Congress sought to fulfill. By 1945, the United States had entered into agreements creating several important multilateral organizations, including the United Nations (UN), the International Monetary Fund (IMF), the World Bank, the UN Relief and Rehabilitation Administration (UNRRA), and the Food and Agriculture Organization (FAO). See *id.*, at 2.

The founding agreements for several of these organizations required member states to grant them broad immunity from suit. The Bretton Woods Agreements, for example, provided that the IMF "shall enjoy immunity from every form of judicial process except to the extent that it expressly waives its immunity." Articles of Agreement of

the International Monetary Fund, Art. IX, §3, Dec. 27, 1945, 60 Stat. 1413, T. I. A. S. No. 1501. UNRRA required members, absent waiver, to accord the organization "the facilities, privileges, immunities, and exemptions which they accord to each other, including . . . [i]mmunity from suit and legal process." 2 UNRRA, A Compilation of the Resolutions on Policy: First and Second Sessions of the UNRRA Council, Res. No. 32, p. 51 (1944). And the UN Charter required member states to accord the UN "such privileges and immunities as are necessary for the fulfillment of its purposes." Charter of the United Nations, Art. 105, 59 Stat. 1053, June 26, 1945, T. S. No. 993.

These international organizations expected the United States to provide them with essentially full immunity. And at the time the treaties were written, Congress understood that foreign governments normally enjoyed immunity with respect to their commercial, as well as their noncommercial, activities. Thus, by granting international organizations "the same immunity from suit" that foreign governments enjoyed, Congress expected that international organizations would similarly have immunity in both commercial and noncommercial suits.

More than that, Congress likely recognized that immunity in the commercial area was even more important for many international organizations than it was for most foreign governments. Unlike foreign governments, international organizations are *not* sovereign entities engaged in a host of different activities. See R. Higgins, Problems & Process: International Law and How We Use It 93 (1994) (organizations do not act with "'sovereign authority,'" and "to assimilate them to states . . . is not correct"). Rather, many organizations (including four of the five I mentioned above) have specific missions that often require them to engage in what U. S. law may well consider to be commercial activities. See *infra*, at 12.

Nonetheless, under the majority's view, the immunity of

many organizations contracted in scope in 1952, when the State Department modified foreign government immunity to exclude commercial activities. Most organizations could not rely on the treaty provisions quoted above to supply the necessary immunity. That is because, unless the treaty provision granting immunity is "self-executing," *i.e.*, automatically applicable, the immunity will not be effective in U. S. courts until Congress enacts additional legislation to implement it. See *Medellin* v. *Texas*, 552 U. S. 491, 504–505 (2008); but see *id.*, at 546–547 (BREYER, J., dissenting). And many treaties are not self-executing. Thus, in the ordinary case, not even a treaty can guarantee immunity in cases arising from commercial activities.

The UN provides a good example. As noted, the UN Charter required the United States to grant the UN all "necessary" immunities, but it was not self-executing. In 1946, the UN made clear that it needed absolute immunity from suit, including in lawsuits based upon its commercial activities. See Convention on Privileges and Immunities of the United Nations, Art. II, §2, Feb. 13, 1946, 21 U. S. T. 1422, T. I. A. S. No. 6900 (entered into force Apr. 29, 1970); see also App. to S. Exec. Rep. No. 91–17, p. 14 (1970) ("The U. N.'s immunity from legal process extends to matters arising out its commercial dealings . . . "). But, until Congress ratified that comprehensive immunity provision in 1970, no U. S. law provided that immunity *but for* the Immunities Act. *Id.*, at 1. Both the UN and the United States found this circumstance satisfactory because they apparently assumed the Immunities Act extended immunity in cases involving both commercial and noncommercial activities: When Congress eventually (in 1970) ratified the UN's comprehensive immunity provision, the Senate reported that the long delay in ratification "appears to have been the result of the executive branch being content to operate under the provisions of the" Immunities Act. *Id.*, at 2.

In light of this history, how likely is it that Congress, seeking to "satisfy *in full* the requirements of . . . international organizations conducting activities in the United States," S. Rep. No. 861, at 2–3 (emphasis added), would have understood the statute to take from many international organizations with one hand the immunity it had given them with the other? If Congress wished the Act to carry out one of its core purposes—fulfilling the country's international commitments—Congress would not have wanted the statute to change over time, taking on a meaning that would fail to grant not only full, but even partial, immunity to many of those organizations.

## B

Congress also intended to facilitate international organizations' ability to pursue their missions in the United States. To illustrate why that purpose is better served by a static interpretation, consider in greater detail the work of the organizations to which Congress wished to provide broad immunity. Put the IMF to the side, for Congress enacted a separate statute providing it with immunity (absent waiver) in all cases. See 22 U. S. C. §286h. But UNRRA, the World Bank, the FAO, and the UN itself all originally depended upon the Immunities Act for the immunity they sought.

Consider, for example, the mission of UNRRA. The United States and other nations created that organization in 1943, as the end of World War II seemed in sight. Its objective was, in the words of President Roosevelt, to "'assure a fair distribution of available supplies among'" those liberated in World War II, and "'to ward off death by starvation or exposure among these peoples.'" 1 G. Woodbridge, UNRRA: The History of the United Nations Relief and Rehabilitation Administration 3 (1950). By the time Congress passed the Immunities Act in 1945, UNRRA had obtained and shipped billions of pounds of food, clothing,

and other relief supplies to children freed from Nazi concentration camps and to others in serious need.  3 *id.*, at 429; see generally L. Nicholas, Cruel World: The Children of Europe in the Nazi Web 442–513 (2005).

These activities involved contracts, often made in the United States, for transportation and for numerous commercial goods.  See B. Shephard, The Long Road Home: The Aftermath of the Second World War 54, 57–58 (2012). Indeed, the United States conditioned its participation on UNRRA's spending what amounted to 67% of its budget on purchases of goods and services in the United States.  *Id.*, at 57–58; see also Sawyer, Achievements of UNRRA as an International Health Organization, 37 Am. J. Pub. Health 41, 57 (1947) (describing UNRRA training programs for foreign doctors within the United States, which presumably required entering into contracts); *International Refugee Org.* v. *Republic S. S. Corp.*, 189 F. 2d 858, 860 (CA4 1951) (describing successor organization's transportation of displaced persons, presumably also under contract). Would Congress, believing that it had provided the absolute immunity that UNRRA sought and expected, also have intended that the statute be interpreted "dynamically," thereby removing most of the immunity that it had then provided—not only potentially from UNRRA itself but also from other future international organizations with UNRRA-like objectives and tasks?

## C

This history makes clear that Congress enacted the Immunities Act as part of an effort to encourage international organizations to locate their headquarters and carry on their missions in the United States.  It also makes clear that Congress intended to enact "basic legislation" that would fulfill its broad immunity-based commitments to the UN, UNRRA, and other nascent organizations. S. Rep. No. 861, at 2.  And those commitments, of neces-

sity, included immunity from suit in commercial areas, since organizations were buying goods and making contracts in the United States.

To achieve these purposes, Congress enacted legislation that granted necessarily broad immunity. And that fact strongly suggests that Congress would not have wanted the statute to reduce significantly the scope of immunity that international organizations enjoyed, particularly organizations engaged in development finance, refugee assistance, or other tasks that U. S. law could well decide were "commercial" in nature. See *infra*, at 12.

To that extent, an examination of the statute's purpose supports a static, not a dynamic, interpretation of its cross-reference to the immunity of foreign governments. Unlike the purpose of the Civil Rights Act, the purpose here was not to ensure parity of treatment for international organizations and foreign governments. Instead, as the Court of Appeals for the D. C. Circuit pointed out years ago, the statute's reference to the immunities of "foreign governments" was a "shorthand" for the immunities those foreign governments enjoyed at the time the Act was passed. *Atkinson* v. *Inter-American Development Bank*, 156 F. 3d 1335, 1340, 1341 (1998).

## III

Now consider the consequences that the majority's reading of the statute will likely produce—consequences that run counter to the statute's basic purposes. Although the UN itself is no longer dependent upon the Immunities Act, many other organizations, such as the FAO and several multilateral development banks, continue to rely upon that Act to secure immunity, for the United States has never ratified treaties nor enacted statutes that might extend the necessary immunity, commercial and noncommercial alike.

A

The "commercial activity" exception to the sovereign immunity of foreign nations is broad. We have said that a foreign state engages in "commercial activity" when it exercises "'powers that can also be exercised by private citizens.'" *Republic of Argentina*, 504 U. S., at 614. Thus, "a contract to buy army boots or even bullets is a 'commercial' activity," even if the government enters into the contract to "fulfil[l] uniquely sovereign objectives." *Ibid.*; see also H. R. Rep. No. 94–1487, p. 16 (1976) ("[A] transaction to obtain goods or services from private parties would not lose its otherwise commercial character because it was entered into in connection with an [Agency for International Development] program").

As a result of the majority's interpretation, many of the international organizations to which the United States belongs will discover that they are now exposed to civil lawsuits based on their (U. S.-law-defined) commercial activity. And because "commercial activity" may well have a broad definition, today's holding will at the very least create uncertainty for organizations involved in finance, such as the World Bank, the Inter-American Development Bank, and the Multilateral Investment Guarantee Agency. The core functions of these organizations are at least arguably "commercial" in nature; the organizations exist to promote international development by investing in foreign companies and projects across the world. See Brief for International Bank for Reconstruction and Development et al. as *Amici Curiae* 1–4; Brief for Member Countries and the Multilateral Investment Guarantee Agency as *Amici Curiae* 13–15. The World Bank, for example, encourages development either by guaranteeing private loans or by providing financing from its own funds if private capital is not available. See Articles of Agreement of the International Bank for Reconstruction and Development, Art. I, Dec. 27, 1945, 60 Stat. 1440, T. I. A. S. No.

1502.

Some of these organizations, including the International Finance Corporation (IFC), themselves believe they do not need broad immunity in commercial areas, and they have waived it. See, *e.g.*, Articles of Agreement of the International Finance Corporation, Art. 6, §3, Dec. 5, 1955, 7 U. S. T. 2214, 264 U. N. T. S. 118 (implemented by 22 U. S. C. §282g); see also 860 F. 3d 703, 706 (CADC 2017). But today's decision will affect them nonetheless. That is because courts have long interpreted their waivers in a manner that protects their core objectives. See, *e.g.*, *Mendaro* v. *World Bank*, 717 F. 2d 610, 614–615 (CADC 1983). (This very case provides a good example. The D. C. Circuit held below that the IFC's waiver provision does not cover petitioners' claims because they "threaten the [IFC's] policy discretion." See 860 F. 3d, at 708.) But today's decision exposes these organizations to potential liability in *all* cases arising from their commercial activities, without regard to the scope of their waivers.

Under the majority's interpretation, that broad exposure to liability is at least a reasonable possibility. And that being so, the interpretation undercuts Congress' original objectives and the expectations that it had when it enacted the Immunities Act in 1945.

B

The majority's opinion will have a further important consequence—one that more clearly contradicts the statute's objectives and overall scheme. It concerns the important goal of weeding out lawsuits that are likely bad or harmful—those likely to produce rules of law that interfere with an international organization's public interest tasks.

To understand its importance, consider again that international organizations, unlike foreign nations, are multilateral, with members from many different nations.

See H. R. Rep. No. 1203, at 1. That multilateralism is threatened if one nation alone, through application of its own liability rules (by nonexpert judges), can shape the policy choices or actions that an international organization believes it must take or refrain from taking. Yet that is the effect of the majority's interpretation. By restricting the immunity that international organizations enjoy, it "opens the door to divided decisions of the courts of different member states," including U. S. courts, "passing judgment on the rules, regulations, and decisions of the international bodies." *Broadbent* v. *Organization of Am. States*, 628 F. 2d 27, 35 (CADC 1980); cf. Singer, Jurisdictional Immunity of International Organizations: Human Rights and Functional Necessity Concerns, 36 Va. J. Int'l L. 53, 63–64 (1995) (recognizing that "[i]t would be inappropriate for municipal courts to cut deep into the region of autonomous decision-making authority of institutions such as the World Bank").

Many international organizations, fully aware of their moral (if not legal) obligations to prevent harm to others and to compensate individuals when they do cause harm, have sought to fulfill those obligations without compromising their ability to operate effectively. Some, as I have said, waive their immunity in U. S. courts at least in part. And the D. C. Circuit, for nearly 40 years, has interpreted those waivers in a way that protects the organization against interference by any single state. See, *e.g.*, *Mendaro*, 717 F. 2d, at 615. The D. C. Circuit allows a lawsuit to proceed when "insistence on immunity would actually prevent or hinder the organization from conducting its activities." *Id.*, at 617. Thus, a direct beneficiary of a World Bank loan can generally sue the Bank, because "the commercial reliability of the Bank's direct loans . . . would be significantly vitiated" if "beneficiaries were required to accept the Bank's obligations without recourse to judicial process." *Id.*, at 618. Where, however, allowing

a suit would lead to "disruptive interference" with the organization's functions, the waiver does not apply. *Ibid.*

Other organizations have attempted to solve the liability/immunity problem by turning to multilateral, not single-nation, solutions. The UN, for instance, has agreed to "make provisions for appropriate modes of settlement of . . . [d]isputes arising out of contracts or other disputes of a private law character." Convention on Privileges and Immunities of the United Nations, Art. VIII, §29, 21 U. S. T. 1438, T. I. A. S. No. 6900. It generally does so by agreeing to submit commercial disputes to arbitration. See Restatement (Third) of Foreign Relations Law of the United States §467, Reporters' Note 7 (1987). Other organizations, including the IFC, have set up alternative accountability schemes to resolve disputes that might otherwise end up in court. See World Bank, Inspection Panel: About Us (describing World Bank's three-member "independent complaints mechanism" for those "who believe that they have been . . . adversely affected by a World Bank-funded project"), https://inspectionpanel.org/about-us/about-inspection-panel (as last visited Feb. 25, 2019); Compliance Advisor Ombudsman, How We Work: CAO Dispute Resolution (describing IFC and Multilateral Investment Guarantee Agency dispute-resolution process, the main objective of which is to help resolve issues raised about the "social and environmental impacts of IFC/MIGA projects"), www.cao-ombudsman.org/howwework/ombudsman.

These alternatives may sometimes prove inadequate. And, if so, the Immunities Act itself offers a way for America's Executive Branch to set aside an organization's immunity and to allow a lawsuit to proceed in U. S. courts. The Act grants to the President the authority to "withhold," to "withdraw," to "condition," or to "limit" any of the Act's "immunities" in "light of the functions performed by any such international organization." 22 U. S. C. §288.

Were we to interpret the statute statically, then, the default rule would be immunity in suits arising from an organization's commercial activities. But the Executive Branch would have the power to withdraw immunity where immunity is not warranted, as the Act itself provides. And in making that determination, it could consider whether allowing the lawsuit would jeopardize the organization's ability to carry out its public interest tasks. In a word, the Executive Branch, under a static interpretation, would have the authority needed to separate lawsuit sheep from lawsuit goats.

Under the majority's interpretation, by contrast, there is no such flexibility. The Executive does not have the power to tailor immunity by taking into account the risk of a lawsuit's unjustified interference with institutional objectives or other institutional needs. Rather, the majority's holding takes away an international organization's immunity (in cases arising from "commercial" activities) across the board. And without a new statute, there is no way to restore it, in whole or in part. Nothing in the present statute gives the Executive, the courts, or the organization the power to restore immunity, or to tailor any resulting potential liability, where a lawsuit threatens seriously to interfere with an organization's legitimate needs and goals.

Thus, the static interpretation comes equipped with flexibility. It comes equipped with a means to withdraw immunity where justified. But the dynamic interpretation freezes potential liability into law. It withdraws immunity automatically and irretrievably, irrespective of institutional harm. It seems highly unlikely that Congress would have wanted this result.

\*    \*    \*

At the end of World War II, many in this Nation saw international cooperation through international organiza-

tion as one way both to diminish the risk of conflict and to promote economic development and commercial prosperity. Congress at that time and at the request of many of those organizations enacted the Immunities Act. Given the differences between international organizations and nation states, along with the Act's purposes and the risk of untoward consequences, I would leave the Immunities Act where we found it—as providing for immunity in both commercial and noncommercial suits.

My decision rests primarily not upon linguistic analysis, but upon basic statutory purposes. Linguistic methods alone, however artfully employed, too often can be used to justify opposite conclusions. Purposes, derived from context, informed by history, and tested by recognition of related consequences, will more often lead us to legally sound, workable interpretations—as they have consistently done in the past. These methods of interpretation can help voters hold officials accountable for their decisions and permit citizens of our diverse democracy to live together productively and in peace—basic objectives in America of the rule of law itself.

With respect, I dissent.